STATE of Texas et al., Appellants,

v.

VALMONT PLANTATIONS et al., Appellees.

No. 13583.

Court of Civil Appeals of Texas.

San Antonio.

March 29, 1961.

A. J. Vale, Pope & Pope, F. R. Nye, Rio Grande City, L. Hamilton Lowe, Austin, for Valmont Plantations and others.

Will Wilson, Atty. Gen., James Ludlum, First Asst. Atty. Gen., Wayland Rivers, Sp. Asst. Atty. Gen., Edward A. Cazares, Houghton Brownlee, Jr., Charles D. Cabiniss, Asst. Attys. Gen., A. G. Haigh, Edinburg, Arthur A. Klein, Harlingen, Wm. M. Jenkines, Jr., Weslaco, J. D. Vollmer, Mercedes, Kent, Brown & George, Harlingen, Smith, McIlheran & Jenkines, Weslaco, Truett Hubbard, Donna, Kelley, Looney, McLean & Littleton, Edinburg, Vinson, Elkins, Weems & Searls, Houston, James W. Wilson, Washington, D. C., Sawnie B. Smith, Edinburg, A. W. Walker, Jr., Dallas, Hill, King, McKeithan & Reynolds, Mission, Victor W. Bouldin, Houston, for the State and others.

Strickland, Wilkins, Hall & Mills, Mission, for G. M. Pursell and others.

Cunningham & Yznaga, Brownsville, for R. F. Breeden and others.

Ransome & Ray, Brownsville, for Edward Roos and others.

POPE, Justice.

This is a class action to determine whether, in the absence of specific grants of irrigation waters, Spanish and Mexican land grants along the Lower Rio Grande have appurtenant riparian irrigation rights. Broadly stated, it is a suit between appropriators and riparians. The State and numerous water districts assert their rights in the former category; owners of lands out of the original grants assert rights similar to those commonly called riparian rights. Both groups have appealed from the judgment. The trial court concluded that the laws of Spain when the grants were made, did not recognize a riparian right of irrigation, but required an irrigator to exhibit his title to irrigation waters.[1] The riparians protest that conclusion. However, the trial court denied the claims of the appropriators and concluded that the law of Texas has erroneously been settled to the contrary.[2] The appropriators protest that

---

1. "I conclude as a matter of law that it was the law of such granting sovereign at such time, that all men were endowed with the right to the use of the water in the Rio Grande for the following purposes: For drinking by men and animals; as a highway, for the navigation of boats and sailing ships; for fishing; and for domestic necessities. But I conclude further that if such waters were to be used for such specific purposes, as operating a mill, or for irrigation, that a specific grant for such purpose was required to be had from the King of Spain." Conclusion of Law No. 2. See, Blalock, Excerpts from Opinion of Trial Court, Water Law Conference (U. of Tex., 1959) 16; Dobkins, The Spanish Element in Texas Water Law (U. of Tex., 1959) 159–162.

2. "Under the doctrine of *stare decisis*, and the opinion in the case of Motl v. Boyd [116 Tex. 82, 286 S.W. 458], I conclude that as a matter of law all land involved in this case which was granted,

or sold, by the Mexican government, or by the State of Tamaulipas, carried with it, as an appurtenance to any such grant, the riparian right of irrigation, subject only to the hereinafter mentioned limitations." Conclusion of Law No. 4. Dobkins, op. cit., 162.

"I further conclude that as a matter of law, based upon all of the decisions of the Courts of Texas relating to riparian rights, all of the land in each of the original grants involved in this case has a riparian right of irrigation provided that such original grant abuts upon the Rio Grande River, and to the extent that such land naturally casts its surface water into, or drains into said river." Conclusion of Law No. 5.

"Likewise, I conclude as a matter of law, that in a case where an original grant did not abut upon the Rio Grande River, no land in such grant has a riparian right. And, likewise, I conclude as a matter of law that any land involved in this suit which does not lie within the watershed of the Rio Grande River,

conclusion. The trial court then defined the watershed so narrowly that most of the riparian claims were also denied. There are other subsidiary issues, but the controlling question is whether the Spanish and Mexican laws recognized riparian rights to irrigate. The trial court properly denied the riparians' plea in abatement for non-joinder of multiple up-river water diverters, because this is not a partition suit and the judgment is not binding upon non-parties as to their share of the river waters. Mud Creek Irr. Agr. & Mfg. Co. v. Vivian, 74 Tex. 170, 11 S.W. 1078; Wilson v. Reeves County Water Imp. Dist. No. 1, Tex.Civ. App., 256 S.W. 346; 1 Wiel, Water Rights in the Western States (3rd Ed.) 687–688.

■ In our opinion, the Spanish and Mexican grants along the lower Rio Grande did not carry with them appurtenant irrigation rights. We have arrived at our conclusion after considering four basic questions: (1) What law controls the case? (2) What were the laws of Peninsular Spain, Colonial New Spain, the Republic of Mexico, and the later laws of Mexico at the time when certain bancos were cut from Mexico? (3) What were the facts pertaining to each grant and did those facts impliedly grant the right to irrigate with Rio Grande waters? (4) Has stare decisis settled the law that Spanish and Mexican grantees acquired riparian rights to irrigate?

## I. The Applicable Law

■ The law of Spain and Mexico at the time of each grant is the law applicable. The lands involved extend along the north

bank of the Rio Grande from the south line of Zapata County to the Gulf of Mexico.[3] The King of Spain and the Mexican State of Tamaulipas granted these lands during the eighteenth and nineteenth centuries. No grant mentioned nor expressly granted irrigation waters. Eleven bancos, cut from Mexico between 1905 and 1948, are also in suit. We start, therefore, upon the solid premise that grants from Spain, Mexico and Tamaulipas are governed by the law of the sovereigns when the grants were made. Luttes v. State, 159 Tex. 500, 324 S.W.2d 167, 176; Rudder v. Ponder, 156 Tex. 185, 293 S.W.2d 736; State v. Balli, 144 Tex. 195, 190 S.W.2d 71; Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438; Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 408, 85 A.L.R. 451; State v. Grubstake Investment Association, 117 Tex. 53, 297 S.W. 202; Mitchell v. Bass, 33 Tex. 259. The law of those granting sovereigns is the law of Texas which it is our duty to know and follow. State v. Sais, 47 Tex. 307, 318; State v. Cuellar, 47 Tex. 295, 305. Riparians dispute that rule and argue that while the Treaty of Guadalupe-Hidalgo, 9 Stat. 922, forbids a State's diminution of the land titles granted by former sovereigns, the adoption of the common law in 1840, 2 Gammel, Laws of Texas, 177–180, the passage of Texas Confirmation Act of 1852, 3 Gammel, Laws of Texas, 941–949, and the adoption of the Constitutions of 1845 and 1876, Vernon's Ann.St., operated as relinquishments of irrigation waters to the lands along the Lower Rio Grande. That argument was recently laid to rest when the claim was made that Mexican and Spanish grants were bounded by the seashore, as

that is, land which does not naturally cast its water into, or drain into, the Rio Grande River, is without a riparian right." Conclusion of Law No. 6.

| 3. | Grant | Date of Grant |
|---|---|---|
| | Jurisdiction of Mier | 1767 |
| | Jurisdiction of Carmargo | 1767 |
| | Jurisdiction of Reynosa | 1767 |
| | Los Ejidos | 1836 |
| | Los Torritos | 1834 |

| Santa Ana | 1834 |
|---|---|
| Agostodero Del Gato | 1834 |
| La Blanca | 1834 |
| Llano Grande | 1777 |
| La Feria | 1777 |
| Conception de Carricitos | 1780 |
| San Pedro Carricitos | 1834 |
| Potrero Del Espiritu Santo | 1781 |
| Potrero de San Martin | 1829 |
| Potrero de Santa Isabel | 1829 |
| Potrero de Buena Vista | 1829 |

fixed by the common law instead of the civil law line. The Buena Vista Grant was there in suit, as it is here. The Court of Civil Appeals in Luttes v. State, 289 S.W. 2d 357, 359, rejected the argument because it was contrary to the rule announced in the Balli case, 144 Tex. 195, 190 S.W.2d 99. The Supreme Court, after a review of the authorities, affirmed the intermediate court and forcefully stated that every decision, observation or assumption that has ever been made by the Supreme Court on the subject was against the contention. Luttes v. State, supra. The same Texas Congress which adopted the common law, later enacted a statute which stated:

"Sec. 6. Be it further enacted, that it shall not be necessary to prove an actual trespass on the part of the defendant to support this action, nor shall this act be so construed as to alter, impair or take away the rights of parties as arising under the laws in force before the introduction of the common law, but the same shall be decided by the principles of the law or laws under which the same accrued, or by which the same were regulated, or in any manner affected." 2 Gammel, Laws of Texas, 310.

That law has been re-enacted with each revision. Article 4812, Revised Statutes of 1879; Article 5276, Revised Statutes of 1895; Article 7759, Vernon's Sayles Revised Civil Statutes of 1914; Article 7392, Vernon's Annotated Civil Statutes of 1925.

Only with respect to the San Pedro Carricitos is there any contention that the grants were made after December 19, 1836, the date the Texas Republic fixed the Rio Grande as its southern boundary. 1 Gammel, Laws of Texas, 1193–1194. Two owners of lands in that grant argue that the San Pedro grant was made in 1843 by the Mexican government, and that, whatever may be decided as to the other grants, their rights are governed by the common law. In our opinion, this grant stands upon the same footing as the other grants. The grant was sufficiently perfected and was good against the Mexican government on December 19, 1836, and is therefore within the protection of the treaty of Guadalupe Hidalgo. 9 Stat. 926. The record shows that the lands were denounced and then surveyed on November 18, 1834. The survey was signed the next day. Because the survey was made, it is presumed that it was made after written application and after it was determined that adjoining proprietors did not protest. Article 7, Colonization Law of Tamaulipas of 1826, 1 Gammel, Laws of Texas, 454–459; Johns v. Schutz, 47 Tex. 578; Cavazos v. Trevino, 35 Tex. 133. In fact, the survey recites that these are the true facts. The next step in the proceedings was the transmittal of the expediente to the governor, by whom title "shall be issued". Article 8, Colonization Law of 1826, supra. The grant was paid for. This fact is recited in the governor's decree of grant of 1843. When it was paid for is not stated, but it will be presumed that the alcalde properly performed his duties and collected the fees required by Sec. 24 of the Colonization Act, and that he did this before transmitting the expediente to the governor as required by Article 8 of the Colonization Law. State v. Gallardo, 106 Tex. 274, 166 S.W. 369, 373; Haynes v. State, 100 Tex. 426, 100 S.W. 912. As in State v. Gallardo, "everything necessary to make up and complete the right of the purchasers to receive the absolute legal title was done both by them and the government through its officials prior to December 19, 1836, and upon that date nothing was left undone by either that could constitute the substance of the right." See also, State v. Balli, Tex.Civ.App., 173 S.W.2d 522, 535, affirmed 144 Tex. 195, 190 S.W.2d 71; Kenedy Pasture Co. v. State, 111 Tex. 200, 231 S.W. 683. That these facts are recognized by the State of Texas is further confirmed by the Relinquishment Act of 1852, which named and included the San Pedro de Carricitos grant along with the others involved in this suit. 3 Gammel, Laws of Texas, 941–49. See, also, Boquillas Land

& Cattle Co. v. Curtis, 213 U.S. 339, 29 S.Ct. 493, 53 L.Ed. 822; Clark v. Hiles, 67 Tex. 141, 2 S.W. 356. The grant was sufficiently perfected before December 19, 1836, and the grantees were vested with right to title as against the Mexican government. The grant stands on the same basis as the rest of the grants and is governed by the laws of Spain and Mexico.

## II. The Laws of Spain and Mexico

We shall, in order, examine the laws of Peninsular Spain, New Spain, Mexico before Texas Independence, and Mexico after Texas Independence. From each of these sources, we learn that Spain and Mexico did not recognize riparian irrigation rights in navigable river waters.

### Spain.

The laws of Spain are evidenced by the (1) codes, (2) regional laws, (3) decrees of the king contemporaneous to the Spanish grants involved, and (4) the decision of the Supreme Court of Spain. Each of these sources leads to the same conclusion.

1. The United States Supreme Court has said: "The laws of an absolute monarchy are not its legislative acts; they are the will and pleasure of the monarch expressed in various ways—if expressed in any, it is a law; there is no other law-making, law-repealing power—call it by whatever name—a royal order, an ordinance, a cedula, a decree of council, or an act of an authorized officer—if made or promulgated by the king, by his consent or authority, it becomes as to the persons or subject matter to which it relates, a law of the kingdom. It is emphatically so in Spain and all its dominions. Such too, is the law of a Spanish province conquered by England. The instructions of the king to his governors are the supreme law of the conquered colony; *Magna Charta*, still less the common law, does not extend its principles to it. * * * A royal order emanating from the king is a supreme law, superseding and repealing all other preceding ones inconsistent with it." United States v. Arredondo, 6 Pet. 691, 714, 8 L. Ed. 547, 556; Mitchel v. United States, 9 Pet. 711, 9 L.Ed. 283.

The decrees of the king, from time to time, were collected and codified.[4] Since a new code repealed only those portions of a former code which conflicted with the newer code, it was and is often necessary to search former codes as well as the more recent ones. Las Siete Partidas was published in 1263 and it is recognized as the essence of the law of Peninsular Spain after 1348.[5] It borrowed extensively from Fuero Real and Justinian's sixth century code. The Partidas briefly discussed waters. Titles 28, 29, 31, 32, Part 3, Las Siete Partidas. It stated that the waters of navigable rivers for stated purposes may be used by all persons in common. Among those uses were navigation, mooring of boats, making repairs on ships or sails, landing merchandise, fishing and drying nets. Laws 3 and 6, Title 28, Part 3, Las Siete Partidas. Other later laws recognized these same common uses. Law 5, Title 17, Book 4, Recopilacion; 2 White Recopilcion 56; Art. 56, Title 2, Book 4, Constitutiones de Cataluna; Law 11, Rubrica 12, Book 9, Fueros de Valencia. The Partidas discussed servitudes of ditches,

4. Fuero Juzgo (Visigoth–693); Fuero Viejo de Castilla (992); Fuero Real de Espana (1255); Las Siete Partidas (1263); Especulo (1280); Leyes de los Adelantados Mayores (1282); Leyes del Estilo (1310); Ordenamiento de las Tafurerias (1314); Ordenamiento de Alcala (1348); Ordenanzas Reales de Castilla (1485); Ordenamiento Real (1490); Leyes de Toro (1505); Nuevo Recopilacion (1567); Recopilacion (1680); Novissima Recopilacion (1805). These sources are discussed in 1 Moreau and Carleton, 1 Partidas (New Orleans, 1820) III–XXV, and 1 White, Land Law in California, Oregon, Texas (1893), VIII–XI. White's work is commonly cited as "White, New Recopilacion," and will be cited hereafter as White.

5. By force of Ordenamiento de Alcala (1348); See, Scott, Las Siete Partidas, LIII.

aqueducts and canals. Laws 4, 5, 12, 14, Title 31, Part 3. It briefly discussed irrigation. Law 5, Title 31, Part 3; Laws 13, 15, 16, Title 32, Part 3. It stated that there were restrictions upon mills and canals, "because it would not be wise that the benefit of all men be hindered by the interest of some individuals." Law 8, Title 28, Part 3. Contrasted with the idea of the common use of waters from navigable streams for stated purposes was the rule that springs and wells on a man's premises were not for common use. Law 19, Title 32, Part 3. Nowhere does the Partidas discuss how individuals acquired the right to irrigate with river waters. 1 Kinney, Irrigation and Water Rights (1912) Sec. 573.

2. Regional laws even more specifically reveal the laws of Spain.[6] In Cataluna, the necessity for a water grant was spelled out by the King's eighteenth century authorization to his agents.[7] Elsewhere, in Spain the same idea prevailed. Kinney in 1 Irrigation and Water Rights, § 76, states:

"In the regulation of agriculture and the irrigation of lands, no nation of ancient times ever possessed more just and beneficent laws than the agrarian edicts of the Spanish-Arabs, or Moors. Evidence of this still exists in portions of Spain, especially in Valencia, where, when the Moors were driven out, King Jayme, who was wise enough to appreciate their great skill and progress in the art of irrigation,

decreed that 'water should be taken and used in the order that was established of old, and was customary in the times of the Saracens.' Also in Granada, Ferdinand and Isabella recognized that it was good policy to preserve the admirable systems of irrigation established by their enemies, and those who consented to change their faith were guaranteed protection in the enjoyment of their estates and irrigation rights and customs, some of which are embraced in the present irrigation codes of Granada."

3. Contemporaneous to the period of the instant Spanish grants, Phillip V decreed in July, 1717:

"Jurisdiction over waters, in cases concerning collection of dues, taxes and manorial charges for the transfer of landed property belonging to the Royal Treasury, pertains exclusively to the Superintendent; but in cases involving the course of public waters, damages and impairments to roads and public places or private estates, over which the Royal Treasury has no concern, and in litigations regarding possession and other rights with which the Treasury is equally unconcerned, the jurisdiction of the Audencia must be exclusive; and authorization for the sale of public waters, because it is a prerogative of His Majesty, must be obtained precisely from His Royal

---

6. 1 Moreau and Carleton, op. cit., VII; Scot, ibid., LIV.

Cataluna, one of the provinces, in the thirteenth century was governed by Constitutiones de Cataluna and they treated land, waters, and minerals as separate substances. Its Title III, Book IV provided: "Public roads, flowing waters and live springs, pasture lands, forests and exidos (land held in common by villages) and the veins of hard stone that exist in this country belong to the Postedades (lords of the land), not so that they may hold them in allodium, but in a manner that such things may be for the profit of all the villages, without impediment or contradiction from anybody, and without specific service." 2 Franquet y

Bertran, Legislacion de Aguas (Madrid, 1864) 33.

7. "The Bailos de Aguas shall have under their care all that pertains to public waters, not only of rivers, but also of springs or any others, and they shall arrange the proper regime and course of them, and the building of conduits, dams and bridges, and they shall make the allotments of water in proportion to the lands, and they shall deny the use of such water to any persons who have not a legitimate title to the aforementioned waters, issued by His Majesty, or by the Ministerio de la Bailia General, which afore was aggregated to the intendencia." 2 Franquet y Bertran, ibid., 40.

Person and granted with some tax or due attached as always has been done and in the matter of these, taxes and dues, as well as the dues from the transfer of granted waters, the Superintendent should have jurisdiction." 2 Autos Acordados (Madrid, 1777), 75.

4. The Supreme Court of Spain in 1852, in a dispute between Jose Portavella and Mariano and Pedro Moret, has stated about as clearly as words can express the idea, citing Las Siete Partidas and other more recent authorities, that a permit to use water was necessary in Spain prior to 1845:

"1st. That the laws, previous to 1845, did not give a right to alter the flow of a river, or to use the water, even if no works had been built in the bed of the river, if the party in interest had not previously obtained a permit from the Government.

"2nd. That the liberty conceded by the decree of July 19, 1813, and August 11, 1811, was not unrestrained, but ruled by general law, to-wit, Law 18, Title 32, Partidas 3, and other more recent laws 'whose provisions will admit no doubt that all works in rivers, whether navigable or not, required a permit from the Supreme Government.' " [8]

### New Spain.

The special laws of Colonial Spain did not recognize a riparian system of irrigation. We arrive at this conclusion from (1) the specific provision of Recopilacion and (2) the writings of the commentators.

1. Mexico and what is now Texas fell on Spain's side of the 1493 papal line of demarcation.[9] According to the laws of Spain, the King owned a monopoly over the Indies. They were his private property, his royal patrimony. Colonial administration was his exclusive prerogative and the King's will was the law. Vance, The Background of Hispanic-American Law, 128–129; Hall, The Laws of Mexico, 2; Retinger, Tierra Mexicana, 30–42; Rivera, Ordenanzas de Tierras y Aguas, 262; Pereyra, Chap. 12, Book 6, Politica Indiana (1648); Sheldon v. Milmo, 90 Tex. 1, 36 S.W. 413, 419; Goode v. McQueen's Heirs, 3 Tex. 241, 254. In 1520, the King created his Council of the Indies to cope with the countless new problems of his colonies.[10] Its decrees governed New Spain, and the King gave it "supreme jurisdiction over the Indies."[11] The King's will concerning the colonies was therefore expressed through his Council of the Indies.[12] Laws poured from the Council in profusion and, from time to time, partial collections were attempted. In 1680 the former decrees were codified into the Recopilacion de las Leyes de las Indias. The decree which promulgated the edition declared: "That the laws contained in this book are given for the good government and administration of justice by our Council of the Indies * * *." The Recopilacion itself provided that matters not covered in the edition nor by later decrees, were to be decided by recourse to the general laws of Spain.[13]

---

8. 2 Franquet y Bertran, ibid., 647.

9. West, Validity of Certain Spanish Land Grants in Texas, 2 Tex.L.Rev. 435; Taylor, The Spanish Archives of the General Land Office of Texas (Austin, 1955), 6.

10. 2 White, 19–20; Vance, The Background of Hispanic-American Law (New York, 1943), 131–132.

11. Vance, ibid., 128–133; Taylor, op. cit., 6–8.

12. " * * * it is our will and pleasure that said Council (of Indies) have su-preme jurisdiction throughout our West Indies, now discovered, or which may hereafter be discovered, and over the transactions there arising and depending * * *." Law 2, Title 2, Book 2, Recopilacion; accord, Laws 1, 2, 39, 40, Title 1, Book 2, Recopilacion. See, 2 White, 24–27.

13. Law 2, Title 1, Book 2, Recopilacion; 2 White, 24–26; Vance, op. cit., 163. For the most part, this meant that Las Siete Partidas was looked to if Recopilacion was silent. Scott, op cit., LIII; 1 Moreau and Carleton, op. cit., XVII and

Recopilacion and subsequent orders from the Council, when they covered a subject, therefore, were intended as controlling expressions of the King's will.

Recopilacion makes rather clear what the King intended. It shows that in New Spain he intended that waters from rivers were for the common use of all men unless and until there was a title from the King.[14] It shows that Don Felipe II in 1563 and also Don Felipe IV in 1631, established a system of water judges in the colonies.[15] Water was to be apportioned "according to need," and colonial officials were authorized to make grants not merely of lands, but also of lands and waters. Laws 7, 9, 11, Title 17, Book 4; Laws 4, 5, 8, 18, Title 12, Book 4, Recopilacion; 2 White, New Recopilacion, 50–51; Dobkins, The Spanish Element in Texas Water Law, 87–88. Land classification was a distinct quality of the Spanish laws and the classifications distinguished between irrigable and non-irrigable lands, Law 14, Title 17, Book 4, Recopilacion; 2 White, New Recopilacion, 47, lands useful for irrigation and lands useful for stock raising, Laws 8, 18, Title 12, Book 4, Recopilacion, "cultivated lands" and "pastures", Law 9, Title 5, Book 4, Recopilacion; Laws 5, 13, Title 12, Book 4, Recopilacion; 2 White, New Recopilacion, 45, 50, 52, "sugar plantations and other cultivated lands" and "cattle ranches". Law 5, Title 17, Book 6, Recopilacion. So important was classification and the use of land that a special order was dispatched to the viceroys to remove cattle from the irrigable lands.[16] The quantity of land granted and its price depended upon the classification. Irrigable land cost more and was granted in lesser quantities than non-irrigable or pasture lands. Law 9, Title 5, Book 4, Recopilacion. "Each one shall be given the water he should have, alternating from one to another." Law 11, Title 17, Book 4, Recopilacion.

2. The commentators have greatly aided our investigation of the laws of Colonial New Spain, for they have written rather fully about waters. In 1761, the Viceroy

---

XVIII. Recopilacion is often entirely ignored. See, Davenport, Riparian v. Appropriation Rights, Water Conference Proceedings (U. of T.1954), 138, 152.

14. "We have ordered that pastures, forests and waters be common in the Indies * * *, and this shall be observed wherever there shall be no title or authority from ourselves by which a different disposition should be made." Laws 5, 7, Title 17, Book 4, Recopilacion; 2 White, 56. Accord, Galvan, Ordenanzas de Tierras y Aguas (Mexico, 1844), 157; Hamilton, Mexican Law (1882), 116.

However, springs and waters originating on lands, unlike river waters, went with the land. Law 19, Title 32, Part 3, Las Siete Partidas; Lares, Lecciones de Derecho Administrativo, 78, 79; Galvan, Ordenanzas de Tierras y Aguas, 263. This distinction has sometimes confused modern writers. See, 21 Vernon's T.C.S. (1954) XV; Davenport and Canales, Texas Law of Waters (1949), 16; Proceedings (U. of Tex.1954) 138, 153; Davenport, Texas Law of Flowing Waters, 8 Bay.L.Rev. 139, 154, 173.

15. "We decree that the assembled audiencias name judges, unless a contrary custom shall exist, as nominated by the Viceroy or President City and Corporate Town who shall apportion waters to the Indians for the irrigation of their farms, orchards, and seed beds, and to water their cattle. They are to be such as shall offend no one and shall apportion waters according to need. The distribution accomplished, they shall render account thereof to the Viceroy or President who shall relate to us their methods of procedure. We further decree that the judges shall not proceed at the cost of the Indians and in causes of which they take cognizance, if their judgments are appealed, that which the audiencia determines shall be executed without regard to the appeal, in view of the brevity required by such cases. This done, if the parties should appeal, the audiencia shall admit them for review and determine what justice may be." Law 63, Title 2, Book 3, Recopilacion.

16. "We order the viceroys to inform themselves as to the lands which there may be that are irrigable; and that they order the cattle to be taken therefrom, and that said lands be sown in wheat; unless the owners have titles to maintain this type of farm." Law 13, Title 12, Book 4, Recopilacion; 2 White, 52.

of New Spain authorized the publication of Reglamento General de las Medidas de Aguas, a commentary written by Lasso de la Vega.[17] This is significant because the same Viceroy later authorized several of the grants along the Rio Grande. The author wrote:

"And limiting myself to waters, as a guide and foundation of all this reglamento, I find that they are in the same manner of the Royal Patrimony, as the other things, that as such they are annexed to or incorporated in his Royal Crown, and therefore are called realengos, to such an extent that to possess them it is necessary that the private possessor allege and prove that these things have been conceded to them by a special grant (merced) from the same king and Catholic Masters, or in their name; because the law says: Only the Prince and no one else has the right to grant water, and so we must consider null and void the quasi-possession to which we find regalia, be they by measure or in other form, if the Royal Hand has had no part in the distribution. For all of this, besides the titles of the volume, we have express and clear provisions in our laws and Partidas and Recopilaciones, which regulations, in this point, show plainly all the power, hand

and jurisdiction with which His Majesty acts in the servitude of water, not only in the cases of possession but also in those of ownership.

"And limiting this dominion to that which appertains to our Indies, I conclude with the same words and doctrine of Juan de Solorzano [18] on the cited laws, that our glorious and Catholic Kings have a royalty (regalia) in them. From this it may be inferred: that all that by Royal will has not been conceded, remains in the despotic and absolute dominion of the Sovereign, it needs to be said, for the right interpretation of this subject that all the waters of public rivers being, as they are, of public and common use, they are not so with reference to personal and domestic use, which is in accordance with the general freedom with which any one can take the water he wants to succor his domestic needs, as Father Avendano wrote in his exposition to the text of the Institutes. But going back to the main subject, it is a legitimate conclusion, from all that has been said, that no one without permission of the Prince can conduct public waters to his lands for irrigation, especially in this New Spain, where, let it be known, His Majesty has conceded very ample powers to the most excellent and high

17. This was reprinted in Galvan, Ordenanzas de Tierras y Aguas (Mexico, 1844) 155–157. Galvan, in commenting on the work said: "This regulation has served as a guide in matters of waters as it is the only one on this subject which has been considered as approved by competent authority. This is the effect of the permit given for its circulation by His Excellency, the Marquis of Cruillas, then Viceroy of Mexico, as evidenced by a decree given on April 16, 1761. * * * This seems to prove that if the said Regulation contained principles contrary to the laws and ordinances relating to waters, its circulation would not have been permitted, especially since it refers to such an important and transcendental subject as the one discussed by the above mentioned Regulation."

18. The reference is to Don Juan de Solorzano y Pereyra, an early member of the Council of Indies. 2 White, 23. He had written in Book 6, Chapter 12, Politica Indiana (1647, Government of the Indies): "Another right of no less importance corresponds to and is reserved to the Kings and Sovereign Lords by virtue of the supreme power they have over their kingdoms and domains, towit: their right over all of the lands, fields, forests, pastures, rivers and public waters in all their kingdoms. * * And, therefore, whenever litigation arises over these things, or any part of them, whether dealing with possessions or ownership, suit must be brought against any person who does not exhibit immediately legal titles and legitimate privileges by which they may own them."

Viceroys and Presidents of the Audiencia Real of this New Spain, so that in the aforementioned terms, they may issue grants of lands and waters, as things appertaining to His Royal Crown, and for which today there is a special Court."

In Enriquez, Grandes Problemas Nationales (1909, Mexico) 171, the author states that during the colonial period there were:

"A. Grants of lands and waters, in which waters were not designated except in general and vague terms, such as, and waters in these lands contained.

"B. Grants of lands and waters, in which the latter were designated in less vague terms, as, for example, the waters necessary to irrigate the lands granted.

"C. Grants of land without water, with later compositions that included the waters.

"D. Grants of water and lands, or of waters alone, the sugar plantations, factories, metal mills, mills, etc.

"E. Grants of water for the supply of towns, and

"F. Grants of water exclusively for irrigation.

"Making a summary of this study with respect to the colonial period we can assert the following conclusions:

"A study of the evolution of ownership of waters induces us to affirm: (1) That the historical origin of private ownership of lands, with the same legal cause, and the same procedure of issuance of titles; (2) That starting from the same point, ownership of lands and ownership of waters followed independent but parallel roads, so that at the end of the colonial period waters were subject to all and each of the principles applicable to lands; (3) That the primary title was always the grant to such an extent that when a title of land did not mention waters, a right of water was never considered to exist, solely by reason of proximity or accession, and therefore the topographical location of riparians did not give such lands any right; (4) The preference in the use of water of certain landholders over others originated not in the location, low or high, near or far, of the tracts of land, but in the antiquity of the grant; (5) Waters that were not granted remained in the Royal Patrimony; (6) In New Spain the distinction of Spanish Peninsular Law between public and private rivers was never in force, nor did colonial law contemplate rivers as things distinct from the waters, because it was the property of the Crown; and (7) Private property in waters not only existed, but the legislation of Indies fostered the reduction of unappropriated waters to private ownership."

In Pena, Propiedad Inmueble en Mexico,[19] we find the same conclusion:

"History and positive law demonstrate that the grant of soil and lands never included the dominion of the waters and mines.

"The historical fact shows that the riparians on our principal rivers, from the first days of the Conquest, hurried to solicit concessions not only of the running waters but also of the springs which flowed into the rivers, and almost all the water of our principal currents were solicited by and granted to the proprietors along its course, so that we may say that from that time there was distributed all the water of the Balsas from its source, of the Zavaleta, of the Lerima and of the Panuco; and

19. Printed in Memoria del Primer Congreso Juridico (Proceedings of the First National Juridical Congress, Mexico, 1921), 146 et seq. The same author states the same rule in 2 Documentos Relacionados con la Legislacion Petrolera (Documents Related to Petroleum Legislation, Mexico, 1922).

as an example of the granting of springs, among many we may point to that of the springs of the plain of Huapango which were granted to the settlers of San Juan del Rio by don Luis de Velasco, those of the spring of 'Nacimiento,' whose water, which spring up in the Hacienda of San Cristobal, was granted to Apaseo el Alto, those of the springs of San Pedro Ahuacatlan, which were in their time granted to the Andrade Moctezumas, owners of San Francisco, and we may say generally that our waters were obtained by grant independent of that which granted the tracts which they later irrigated.

"The same occurred with respect to mines, so that there is no example in our history of any mine which, during the colonial epoch, was possessed by title of the owner of the surface." [20]

We can sum up the colonial law by quoting again from the General Regulation for the Measurement of Waters:

"The guide and fundamental principle, throughout the whole of the regulation will be found to be, that like the others this belongs to the Royal patrimony, that all such property is annexed to, or incorporated into the Royal Crown, denominated herein Royal patrimony, to such a degree that in order to hold possession, it is necessary that individual possessors, must allege and prove that they have been conceded by especial favor of the same Kings and Lords, or in their name, because as the law declares: That to the Prince, and to no other, appertains the right of distribution of water." Galvan, Ordenanzas de Tierras y Aguas (Mexico, 1844) 155; Hamilton, Mexican Law (1882) 110.

## Mexico.

Mexico, after her independence from Spain in 1821, continued the same system of water laws that existed during the colonial period. This fact is not disputed. During this period, the rest of the vast river grants were made by the State of Tamaulipas,[21] and they are controlled by the laws of Mexico and Tamaulipas as they then existed. State v. Gallardo, 106 Tex. 274, 166 S.W. 369. Mexico had a non-riparian system as is revealed (1) by its positive legislative acts, and (2) by the commentators.

1. Mexican legislation reveals a non-riparian system. Lands were classified by the Mexican national government [22] and by the State of Tamaulipas,[23] as lands for

20. The parties are agreed that Spanish and Mexican land grants did not carry with them the minerals, unless expressly granted. Cox v. Robison, 105 Tex. 426, 150 S.W. 1149; Cowan v. Hardeman, 26 Tex. 217. Texas constitutionally relinquished minerals to owners of the soil. Art. 7, § 39, Const. of 1866; Art. 10, § 9, Const. of 1869; Art. 14, § 7, Const. of 1876. There is no comparable relinquishment of irrigation waters to riparians.

21. See footnote 3, supra.

22. Art. 6. In the distribution made by government, of lands to the colonists for the formation of villages, towns, cities and provinces, a distinction shall be made between grazing lands, destined for the raising of stock, and lands suitable for farming or planting, on account of the facility of irrigation.

Art. 7. (Measurements for a labor.)
Art. 8. To the colonists, whose occupation is farming, there cannot be given less than one labor, and those whose occupation is stock raising there can not be given less than one sitio. National Colonization Decree of 1823; 1 Gammel, Laws of Texas, 27, 28.
Art. 12. It shall not be permitted to unite in the same hands with the right of property, more than one league of square of land, suitable for irrigation, four square leagues in superficies, of arable land without the facilities of irrigation, and six square leagues in superficies of grazing land. National Colonization Law of 1824; 1 Gammel, Laws of Texas, 38, 39.

23. Art. 15. That unit taken as a standard, and observing the distinction to be made on the distribution of lands, be-

farming with irrigation, farming without irrigation, or for grazing. The classification determined the purchase price paid for the land as well as the quantity of land granted. Tamaulipas made an additional classification of pasture lands, depending on whether it had the "benefit of running water." There are no grants involved in this case which were made by the State of Coahuila and Texas, but that law followed the same pattern.[24]

2. These conclusions are confirmed by Galvan in his Ordenanzas de Tierras y Aguas (1844), 89–90:

"Notes on the various names and qualities of lands, the practical means by which they should be measured and various other essential points which should be presented for the better understanding of the ordinance taken from the spirit and the letter of the same.

"In point of the names and qualities of lands, it must be understood that: There are three qualities of lands under the royal ordinances, of which the first is called *de Pan sembrar,* the second is called *de Pan cojer,* and the third *de Pan llevar.* Lands *de Pan sembrar* are those where grain grows only by chance; those *de Pan cojer* are those dependent on rainfall for moisture, and those *de Pan llevar* are those which are irrigable; that is those which have water. Each kind of land has a different price, which must be

regulated according to its environs, quality, distance and conditions, and the same is true of sites for large stock, for small stock, for breeding and for horses. Besides these three qualities there are other lands which serve only as pastures for stock, and these are hilly and ravine country; planted lands subject to the plow are called *de Pan llevar* in America, to distinguish them from the breeding lands and rough country where grain can not be raised by dry land farming because of the rust." [25]

It was during this period that the English riparian law was judicially crystallized. Mason v. Hill, 5 Bar & Adol 1; Embrey v. Owen, 6 Ex. 355. See, Davenport and Canales, The Texas Law of Flowing Waters, 35–37; 8 Baylor L.Rev. 139, 175. But by this time, the Spanish-Mexican system had been a developed system for many centuries. We are told that the Spaniards had already become "the best irrigators in the world." 1 Kinney, Irrigation and Water Rights, 272. The English and Eastern States had slight occasion to become irrigators. Spain and Mexico practiced a system of specific grants of water to be consumed in irrigation upon lands classed as irrigable, whether they did or did not front upon a river, and the system was administered by officials.

Mexico after Texas Independence.

Mexico, after Texas independence, continued the non-riparian system of irriga-

---

tween grazing lands, or those suitable for raising stock, and irrigable and temporal tillage lands, this law grants to the contractor or contractors of new towns for every hundred families they introduce and establish in the state five sitios of grazing land and five labores, of which one-half at least shall be temporal land. Colonization Law of Tamaulipas of 1826; 1 Gammel, Laws of Texas, 454, 456.

Art. 23. The new settlers shall pay to the state as an acknowledgment, thirty dollars for each sitio of grazing land, uncultivated, or woodland, that is adjudicated to them; and for those having the benefit of running water an esti-

mate shall be made by two competent persons, chosen by the executive and the settler, setting out from the established rule. Colonization Law of Tamaulipas of 1826; 1 Gammel, Laws of Texas, 457.

24. Arts. 12, 14, 22, Colonization Law of Coahuila and Texas, 1825; 1 Gammel, Laws of Texas, 40–46; Art. 14, Colonization Law of Coahuila and Texas, 1832; 1 Gammel, Laws of Texas, 298–304.

25. Accord, Lares, Leciones de Derecho Administrativo (Lectures on Administrative Law, Mexico, 1852) 78–80.

tion waters. This is evident from (1) its legislative acts, (2) the commentators, and (3) the Mexican legal experts who testified at this trial. This period affords additional proof of the unchanging system of Spanish-Mexican water law, and directly concerns eleven bancos which were cut from Mexico after 1905. By treaty, titles to those lands are governed by the law of Mexico at the time of their cut-off. Article IV, Convention for the Elimination of Bancos, 35 Stat. 1863; Shipleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355. Here again, the parties agree that the Mexican law of irrigation waters, whatever it was continued after Texas Independence.

1. The positive laws of Mexico during this period recognize a system of water appropriation. 1 Hackworth, Digest of International Law, Sec. 65. Government dominion over and administration of river waters has been successively recognized by Mexican Constitutional and Code provisions. Mexican Constitution of 1857, Title 111, § 1, of the Legislative Power, and paragraph 111 of the Powers of the Congress, Art. 72, Part 11; Mexican Code of 1870, Art. 802; Hamilton's Mexican Law (1882) 39–40; Decree of Mexican Congress, June 5, 1888; Decree of Mexican Congress, June 6, 1894; Decree of Mexican Congress, December 16, 1910. See also, Regulations of Law of Waters of National Property (Diario Oficial, April 21, 1936). This concept of Spanish and Mexican river waters, administered and granted by the King or Sovereign, finds one of its strongest witnesses in Title 1, Chapter 1, of the Mexican Constitution of 1917:

"Art. 27. The ownership of lands and waters comprised within the limits of the national territory is vested originally in the Nation, which has had, and has, the right to transmit title thereof to private persons, thereby constituting private property."

2. The Mexican law on the subject is well summarized by the commentator,

Gabino Fraga, who writes in his Derecho Administrativo (Administrative Laws, Mexico, 1944), 673:

"With respect to this subject we should say that the dominion of waters of the territory has the same antecedents as the dominion of lands, but from the time of the colonial legislation a separation has been made between waters which could become part of the private domain of individuals by virtue of a royal grant (merced) and waters which uniting certain special characteristics, were not reducible to such property, adding that in the same Spanish legislation various servitudes in favor of the common uses were reserved even over granted waters."

3. The experts on Mexican law also affirm the Mexican practice of making specific grants of water for irrigation purposes. This is an accepted form of proving the Spanish and Mexican law. State v. Sais, 47 Tex. 307, 318; State v. Cuellar, 47 Tex. 295, 304; McCurdy v. Morgan, Tex.Civ.App., 265 S.W.2d 269. Lic. Onate testified for the appropriators and marshalled many of the legal sources we have cited in this opinion. Lic. Alvarado Ortiz testified for the riparians. He recognized that the writers cited and quoted are authoritative. He said that Galvan's Ordenanzas de Tierras y Aguas was a fundamental historical work on Mexican water law, but he had not read it. He also acknowledged that numerous specific grants of water were made in New Spain to individuals who owned lands that touched on rivers, that water was measured out in terms of the "naranja", the "buey", the "media naranja", the "real", the "paja"; that owners sought grants so that in case of a controversy over water, rights would be determined upon the basis of priority. Those are not the indicia of a riparian system.

### Law Sources of the Riparians.

The riparian claimants rely upon three authorities. They are: (1) Las Siete

Partidas, (2) La Vega's Reglamento General of 1761, and (3) Escriche's Diccionario Razonado of 1847. See, Davenport and Canales, 8 Baylor Law Review 138; Davenport, Water Law Proceedings (U. of Tex.1954), 153.

1. Las Siete Partidas is silent about riparian irrigation rights. It recognizes that certain stated water uses are owned by all men in common, but does not include irrigation as one of them, Law 3, Title 28, Part 3; Law 6, Title 28, Part 3. It prohibits certain uses, Law 8, Title 28, Part 3; recognizes servitudes such as canals which irrigate gardens or other real property and regulates servitudes, Laws 4, 5, 6, 12, 15, Title 31, Part 3; but it says nothing about the source or nature of irrigation rights. Moreover, New Spain had no occasion to resort to the Partidas, for it was a secondary source of colonial law. Moreau and Carleton in their preface to Volume 1, Partidas (New Orleans, 1920), say: "* * * in the Spanish dominions in the Indies, courts of justice should first have recourse to the Royal and Special Edicts (Cedulas), which may have been directed to the chancery of the city or place where the cause is pending; and if there are none, they should then decide according to the common law, which is to be found in the laws of the Recopilacion of the Indies; and where these last are silent, recourse must be had to the Recopilacion of Castille and the Partidas." Those two last cited sources, of course, are the laws of Peninsular Spain, and they are resorted to last. We shall not repeat the abundance of materials from Recopilacion and the commentators which are not silent about the law of specific grants of irrigation waters in colonial Spain.

2. La Vega's Reglamento General affords scant support for the riparian argument, and whatever aid can be found in that commentary is, perhaps, by reason of a wrong translation. We have previously quoted at length from La Vega who in words about as strong as could be written, has stated that "Only the Prince and no one else has the right to grant water," that quasi-possession of the regalia is null and void "if the Royal Hand has had no part in the distribution," that "no one without permission of the Prince can conduct public waters to his lands for irrigation * * *." He would perhaps be the most surprised of all people to learn that out of such strong language, a translation could emerge which would destroy what he was trying to say so clearly.

The translation which the riparians rely upon says: "But, still pursuing the main or principal subject, there appears from all that has been said that no one without permission of the Prince, can divert public waters to his own property for irrigation purposes; more especially in the Kingdom of New Spain; where it must be stated that His Majesty has given ample powers to Their Excellencies, the Viceroys and Presidents of the Royal Audiencias in this Kingdom of New Spain so that in full conformity with what has been said they may make grants of land, *and free distribution of waters for irrigation*, as property that belong to His Royal Crown, and for which there is established a special tribunal, or court." Riparians continue with the translation: "But, in granting the land, if (the waters) either form part of it, *or are essential to its enjoyment; then the water and its sources are also granted*; this is the doctrine of Father Avendano, our Royal Authority on land law, as stated in his Thesauro Indico whose words are copied verbatim at the end of these Regulations." (Emphasis added.) Davenport and Canales, The Texas Law of Flowing Waters, 32; Davenport and Canales, Texas Law of Flowing Waters, 8 Bay.L.Rev. 170.

A correct translation as given by Hamilton's Mexican Law (1882) 111, as well as an examination of the original Spanish, shows that whole phrases have been added. Hamilton's translations are:

"Nevertheless holding the foregoing general principle, it is a legitimate inference, that no one can take public

waters upon his private grounds for irrigation without Royal permission; more particularly, in what is peculiar to New Spain, wherein His Majesty has amply empowered, those most enlightened and excellent gentlemen (Senores), the Vice-roys and Presidents of the Royal Audiencia of New Spain, in entire conformity with the foregoing to make grants of lands and water as appertaining to his Royal Crown, and to have exclusive and special jurisdiction over them. * * *

"But if in concessions of land, concessions are made jointly of the waters originating upon it, as appurtenances of the lands granted, it is a doctrine laid down by Padre Avendano in his Thesauro Indico whose express words we have given to the letter at the end of this Article." See, VIII Bay.L.Rev. 172.

The italicized words are interpolations not found in the original Spanish.[26] La Vega is sometimes quoted out of context. His comments about springs and sources of waters are taken to be authority for irrigation with river waters, but different rules governed those waters.[27]

3. Don Joaquin Escriche is the other author upon whom the riparians rely. He published his first edition of the Diccionario Razonado de Legislacion Civil, Penal, Comercial y Forense in 1831, and explained

that he was not writing a book for lawyers.[28] His first two editions did not discuss water, but in 1847, the year of his death, a third edition, for the first time, contained sections on "Aguas" and "Acequia". The 1847 edition appears to be the first time that the idea of riparian rights in irrigation waters was suggested in the Spanish legal sources. Escriche cites Las Siete Partidas as the only authority for his views. He discussed "Aguas" in four sections. Section one concerned servitudes, and he cited Law 13, Title 32, Part 3, in support of his views. Section two concerned waters which arise on one's own property, such as a spring, and he cited Law 19, Title 32, Part 3. Sections three and four concerned irrigation. Section three[29] expressly limited irrigation to non-navigable rivers and without prejudice to municipal use. After distinguishing navigable from non-navigable rivers, it stated: "If they are navigable, nobody can avail himself of them so as to hinder or embarrass navigation; but if they are not, the owners of the land through which they pass may use the waters thereof for the utility of their farms or their industry, without prejudice to the common use or destiny which the towns on their course shall have given them, and with the modifications provided in the laws, orders, and decrees which are spoken of under the word 'acequia'."

Section four under "Aguas", contained still other limitations which are often over-

26. "Pero insistiendo en el assumpto principal, es lexitima consequencia, que se infiere de todo lo expressado; que qualquiera, sin el permisso del principe, no pueda conducir las aguas publicas a sus fundos, para su irrigacion, mayormente en lo peculiar de esta Nueva-Espana, donde se hace constar el que S.M. ha concedido amplissima facultad a los clarissimos y excelentissimos senores vireyes y presidentes de la audencia real de esta Nueva-Espana, para que in toda conformidad de lo expressado, puedan hacer las *mercedes de tierras y aguas*, como bienes pertenecientes a su real corona, y de que oy ay particular privativo juzgado. (Emphasis added.) * *
   "Pero si en la concession de las tierras, se conceden juntamente las aguas

sus originales, por considerarse partes of frutos de las dichas tierras mercenadas, es doctrina del padre Avendano nuestro Regnicola en su Thesauro Indico (6), cuyas terminantes palabras van a la letra al fin de este Reglamento." Ordenanzas de Tierras y Aguas, Mexico (1883) 262, (1844) 157.

27. See footnote 14, supra.

28. He said he wrote it "for the landlord, for the peasant, for the trader, for people of any class, who not having dedicated themselves to a legal career would like to learn with little work and without loss of time * * *."

29. Translation found in 1 Wiel, Water Rights in the Western States (3rd Ed.), 961–962; 8 Baylor Law Rev. 166–168.

**868**

looked. Prefacing the equitable rules which Escriche announced is the introductory statement: "The use of the running waters which are not of those of which nobody can make use without a license from the authority, must be regulated by the disposition in the municipal ordinances or by the uses and customs of the country, but in default of ordinances and customs, equity and the interest of agriculture dictate the following rules:" It appears, therefore, that a conflicting grant or license foreclosed any riparian right to irrigate, even under Escriche's view. He cited as authority for his views on riparian irrigation, Law 13, Title 32, Part 3, and Law 31, Title 28, Part 3, of the Partidas, neither of which is in point nor authorizes irrigation rights to riparians. 1 Kinney, Irrigation and Water Rights (1912), Sec. 573. We recall that the Supreme Court of Spain in 1852, seven years after Escriche's third edition, searched through Las Siete Partidas, and concluded that in the absence of a permit, there was no right to irrigate.[30] Escriche found more in Las Siete Partidas than could Spain's Supreme Court.

Escriche wrote that "equity and the interest of agriculture dictate the following rules:" He was expressing his personal views. William Hamilton Hall in Irrigation Development (1886) 374, says, "Escriche made a code governing rights on these streams, as applicable where no such ordinances or customs prevailed * * *." Critics have charged that Escriche borrowed his notions from the Code Napoleon, which was never in force in Colonial Spain. It is said that the Dictionary "upon the subject of waters is not much more than a commentary upon the Code Napoleon."[31] Perhaps one can get even closer to his source. In 1825, Duranton published a treatise on the French Civil Law. Stumberg, Guide to the Law and Legal Literature of France (1931), 77–78. Duranton discussed "Waters" in four sections. 5 Duranton, Course in French Law (3rd ed. 1834). Escriche's comments on "Waters" in 1847 were divided into four sections, and coincidentally, into the same sections and arranged in the same order as Duranton.[32] Eschriche's sentences follow the same pattern and verbiage as used by Duranton. Escriche lived in France from 1823 until the

30. See footnote 8, supra.

31. Wiel, Origin and Comparative Development of the Law of Water Courses in the Common Law and in the Civil Law, 6 Cal.L.Rev. 245, 256.
"His (Escriche's) system of riparian rights seems rather to have been founded on French law, but for which I find no sufficient authority in the old Spanish

laws; and the new Spanish laws * * * clearly do not recognize or establish any such doctrine * * *. Escriche is certainly a recognized authority on the old laws of Spain, but his work is certainly very unsatisfactory on the subject of this report." William Hamilton Hall, Irrigation Development (1886), 382.

---

32.

| Duranton's Titles (1834) | Escriche's Titles (1847) |
|---|---|
| 1. Of the Subjugation of the Inferior Estates in Receiving the Waters Which Flow Naturally from the Superior Estates. | Of the Servitude or Burden Which the Inferior Estates Have to Receive the Waters from the Superiors. |
| 2. Of the Right of He Who Has a Spring in His Estate. | Of the Right Which a Proprietor Has Over the Water Which Rises in His Estate. |
| 3. Of the Waters Dependent on the Public Domain. | Of the Waters Which Belong to the Public. |
| 4. Of the Use of Waters Which Border or Traverse an Estate. | Of the Use of Waters Which Pass by the Border or Within an Estate. |

death of Ferdinand VII in 1833. XX Enciclopedia Universal Illustrada (Madrid), 927.

There may be room for Escriche's equity creations if he was writing about the permissive use of waters for irrigation prior to a grant which conflicted with the use. The King and Mexico were interested in irrigation experiments and encouraged water development. So long as a permissive use of river waters did not interfere with granted waters, it may have been tolerated. Laws 5, 7, Title 17, Book 4, Recopilacion; 2 White, 56; Lewis v. San Antonio River Authority, Tex.Civ.App., 343 S.W.2d 475. In the Lewis case we recognized the necessity of grants and the record in that case showed that there were grants. However, the use of ungranted waters did not disturb the power of the King or Mexico to grant that which was being used permissively. In the presence of a water grant, Escriche's views are irrelevant. 1 Kinney, Irrigation and Water Rights, §§ 577, 579, 580. See, Water Law Conference (U. of Tex.1959) 16, 23, 45.

We conclude, as did the trial court, that the laws of Colonial Spain, of Mexico and the State of Tamaulipas at the time of the grants and continuing to the time the last banco was cut from Mexico, did not recognize a system of riparian irrigation rights to river waters.

### III.  The Specific Grants Examined.

■  A separate and distinct method of discerning the King's will is to examine his decrees and de facto acts in making the specific grants in suit.  The terms of the actual grants and the usages and customs of the Spanish province are instructive for it would seem that the Spanish and Mexican officials both knew and followed the law.  State v. Balli, 144 Tex. 195, 190 S.W.2d 71, 90; State v. Cuellar, 47 Tex. 295; Jones v. Muisbach, 26 Tex. 235; Jones v. Garza, 11 Tex. 186; Mitchell v. United States; 1 Kinney, Irrigation and Water Rights, § 576.  Moreover, we may presume that the officers of a former government

complied with and did not violate their authority.  Johns v. Schutz, 47 Tex. 578; Cavazos v. Trevino, 35 Tex. 133.  The King had the power to grant or withhold lands, waters, or minerals, either together or separately.  He had the power to do, and in his sprawling North American dominion may have done, one thing at one time and place, and something different at another time and place.  The riparians' main points are that the Lower Rio Grande grants, by necessary implication, carried with them grants of irrigation waters, though not mentioned.  Their argument is two-fold. First, they contend that the location of lands with ready access to the waters was an implied grant of riparian waters for irrigation.  Second, they contend that the settlers were induced to undertake the hazardous colonization upon an implied promise of waters for irrigation. We shall, therefore, seek to find the King's implied will as expressed in his executed orders concerning the Lower Rio Grande Grants. We shall do this (1) by looking at the King's general orders, (2) by examining the specific acts done in making the grants, and (3) by a comparison with grants and practices elsewhere.

### The General Orders.

The decrees of the Spanish Monarchs disclose that they had little desire to part with their patrimony by implication.  Don Felipe IV in 1631 expressly ordered the audiencias to name judges to apportion waters according to the need for irrigation of farms, orchards, seed beds, and for cattle.  He ordered an accounting to be made to the Viceroy who in turn would report to him. Law 13, Title 2, Book 3, Recopilacion.  Because it was thought that the regalia was inexhaustible, laxity crept in; so the King found it necessary to put the distribution of his things back into the royal hand.  Pereyra, Chapter 12, Book 6, Politicana Indiana (1648).  The King forbade Viceroys and other officers "however high in rank", from granting title without authority from the Council, to cities, towns, pueblos or villages, and warned that violations would

be followed by charges. He nullified grants in violation of his order. Law 6, Title 8, Book 4, Recopilacion; see, Law 15, Title 12, Book 4, Recopilacion. Viceroys were ordered to report their actions with respect to pastures, waters and public buildings, and lands. Law 9, Title 17, Book 4, Recopilacion. Later, the King empowered Viceroys and Presidents of the Royal Audiencias of New Spain to make grants of land and waters. Galvan, Ordenanzas de Tierras y Aguas, 262; Dobkins, The Spanish Element in Texas Water Law, 96–99. On October 5, 1754, contemporaneous with the period of the New Santander colonization, the King issued such an order which surely the Viceroy of Mexico understood.[33] Included in that order was an authorization of rewards to those "Who shall inform of lands, grounds, places, waters, and of uncultivated and desert lands, * * * as being occupied without title." 2 White, 65. The King of Spain in 1763, dealing specifically with the colonies of Nuevo Santander, ordered that the lands should be assigned to the settlers "with documents." These decrees show that the King gave orders, expected them to be obeyed, and desired that memorable acts should be committed to writing and not left to implication.

### History of Nuevo Santander.

The history of the grants along the Rio Grande shows that there was no intent that the colonists would receive waters for irrigation. The Spaniards made copious records. State v. Cuellar, 47 Tex. 295, 304. This record contains full documents of the steps leading up to the grants along the Rio Grande. These records show a uniform system and intent, expressed in writing, after many years of experimentation with irrigation. By the middle of the eighteenth century there were Spanish settlements in Mexico, at El Paso, San Antonio, and along the Texas coast. An unsettled inland area existed from the Guadalupe River in Texas to Tampico, which Jose Escandon, the Count of Sierra Gordo, described as a "bag" in which Indian tribes collected to molest the surrounding country. In 1746 the Viceroy commissioned Escandon to settle Nuevo Santander, of which the Lower Rio Grande was a part. He ordered Escandon "to distribute the lots, lands and waters which are referred to in the laws, to the Indians as well as the soldiers and colonizers * * *." In 1747 Escandon successfully explored the entire region. 3 Casteneda, Our Catholic Heritage, 142–145. He then proceeded to establish colonies at Carmargo, a few miles south of and on a tributary to the Rio Grande;[34] at Reynosa on the north bank of the Rio Grande;[35] and at Mier, eleven miles south of the river and on the Alamo, a tributary to the Rio Grande.[36] In 1750, Escandon inspected his settlements and reported that there were neither canals nor irrigation along the Rio Grande because of floods and the high bank, but he believed such projects were feasible. To the south, his settlements were successfully practicing irrigation. By 1755, he had founded twenty-one settlements. Each was located where water was available, and genuine efforts were made everywhere to stimulate irrigation and to construct canals. Grants were not at first made to colonists in any of the Rio Grande settlements.

33. "That, from the date of this my royal order, the power of appointing sub-delegate judges to sell and compromise for the lands and uncultivated parts of the said dominions, shall belong, thereafter exclusively to the viceroys and presidents of my royal audiences of those kingdoms .* * *. By virtue of this law, my council of the Indies, and its ministers, are excluded from the superintendence and management of this branch of the royal hacienda." 2 White, 62–67.

34. March 5, 1749; 3 Casteneda, Our Catholic Heritage in Texas, 156–162; Taylor, op. cit. supra, note 9, at 80, 83.

35. March 14, 1749; 3 Casteneda, ibid., 162–164. Reynosa was moved to the south bank in 1801.

36. March 6, 1753; 3 Casteneda, ibid., 171–173.

Everything was held in common and communal farming continued for nineteen years.

In 1757, the Viceroy ordered Jose Cuervo and Augustin Alta to inspect and report on the colonies in Nucvo Santander. The Viceroy specified twenty subjects about which he expected a report, including the rivers, canals constructed or being constructed,[37] the lands used for agriculture, the lands watered by rain or by irrigation, the lands suitable for cattle or sheep, and the mineral deposits. Cuervo's report to the Viceroy in October of 1757 included the required information, colony by colony. Some places had irrigation;[38] others had none, but it was considered feasible.[39] Some colonies had no irrigation and it was not deemed feasible.[40] The report recommended that a subsidy be granted certain colonies for canal construction, but was silent about a subsidy at other places. The report was later followed and the subsidies were granted as recommended.[41] The record is silent about some of the settlements.[42]

Camargo, Mier and Reynosa did not have irrigation and the reasons are explained in Cuervo's report.[43] This total absence of

37. "8th. What canals (acequias) have been constructed, or are being constructed on these rivers for the irrigation of lands and what lands are fertilized or can be fertilized by them and to what settlements do they belong?"

| | Settlement | Source | Irrigation | | Canal Subsidy |
|---|---|---|---|---|---|
| 38. | Aguayo | San Marcos | Yes | | Not needed |
| | Santo Domingo de Hoyos | San Antonio | Yes | | Not needed |
| | Llera | Jaumave | Yes | | Not needed |
| | Real de Borbon | Santa Lucia | Yes | | Not needed |
| 39. | Guemes | San Diego | Possible | 41. | Received Subsidy |
| | Horacasitas | Mantle | Possible | | Received Subsidy |
| | Burgos | Burgos arroya | Possible | | Received Subsidy |
| | Escandon | Guayalejo | Possible . | | Received Subsidy |
| | Padilla | Santa Engracia | Possible | | Received Subsidy |
| 40. | Revilla | Salado | No Irrigation | | No Subsidy |
| | Camargo | Rio Grande & San Juan | No Irrigation | | No Subsidy |
| | Mier | Rio Grande El Alamo Puntiagud | No Irrigation | | No Subsidy |
| | Reynosa | Rio Grande | No Irrigation | | No Subsidy |

42. The record does not include the report for Soto la Maria, Santillana, Altimira, Santa Barbara, Jaumave, Palmillas, Real de los Infantos, San Fernando, Dolores, Laredo, Santander, Boca de Cabellero, and Hacienda de San Juan. There were 23 settlements and 3 dwellings in the colonies.

43. Camargo: "Here there is no canal, nor can it be built due to the depth of the bank with respect to the surface of the water of the Rio de San Juan and due to the fact that its waters flow so fast that they appear dammed; and so although on two occasions it has been tried to withdraw it, the residents have met with disillusionment, and they have despaired of obtaining this benefit which would be considerable."

Mier: " * * * in this there is no canal nor does the land afford the opportunity to enjoy this benefit (when it can be had) except on the border of the river in lands of 3 'fanegas de sementers,' which are not worth the work and cost which it would involve."

Reynosa: The engineer was ill at this point and the report was indefinite.

irrigation along the Rio Grande stands out in contrast to the report of successful irrigation elsewhere in Nuevo Santander.[44]

## The General Visits.

Six years after the Cuervo report, the King ordered the lands granted to the colonists. Escandon opposed this step, but in 1767, nineteen years after he began the project, the Viceroy commissioned Juan Palacio and Joseph Ossorio to visit each settlement and perform the necessary acts to make the grants. Sullivan v. Solis, 52 Tex.Civ.App. 464, 114 S.W. 456. These are called the "Acts of the General Visit." The prescribed steps were followed in each colony, including a visual inspection, notice to the settlers; the appointment of experts to classify the lands;[45] the appointment of surveyors by the colonists to work with the Crown surveyors; reports from the land classifiers, and the surveyors; the assignment of lands for the town, the commons, and the individuals; and the marking of the lands.

The General Visits to Camargo, Mier and Reynosa supply full information of what was done and what was intended. See, 8 Baylor Law Review, 146–156; Scott, Historical Heritage of the Rio Grande, 62 et seq. For nineteen years irrigation had been encouraged by the King, the Viceroy, his sub-delegates, Escandon and Cuervo, and the colonists, but in the end the lands in those jurisdictions were classified and granted, upon petition of the colonists, as pasture lands, not as irrigation lands.[46] Scott, Historical Heritage of the Lower Rio Grande, 63, 66, 67. The Llano Grande, La Feria, Concepcion de Carricitos, and Espiritu Santos Grants were tremendously large grants to individuals.[47] Those lands were classified as pastures.[48]

44. Santo Domingo de Hoyos: "From it (the San Antonio River in Mexico) there is taken an abundant canal, by which the settlement enjoys the irrigation of its lots, orchards and farm tracts and by means of this benefit makes its crops early, liberating them from the ill effects occasioned by the weather in longer growing seasons."

45. Their appointment was to "Classify the lands assigned at or near this town, specifying the lands that are irrigable, those that are dependent on rainfall for moisture, those fit for Agriculture, Summer pastures, Commons, enclosed and open grazing and town lands in order to use them for the purposes to which they are adapted * * *." See also, McCurdy v. Morgan, Tex.Civ.App., 265 S.W.2d 269.

46. Camargo: "The lands are all of one and the same quality, without irrigation or especial distinction. * * * The Aridity of the land requires extension in the surveys that all the porciones may have a watering place for cattle, as otherwise they would remain useless and unserviceable" See, 8 Baylor Law Review, 139, 150.

Mier: " * * * all the lands are of the same class without any particular difference, no irrigation except such as may be obtained from the occurrence of Storms." They recommended pasture lands in common next to town "and in the remainder they make the particular porciones though they apprehend that there is not in those assigned sufficient extent to give each his porcion to maintain property and Cattle in this aride and dry country which they recommend * * * and further that a watering place at the river be given to everyone, otherwise the Cattle will certainly perish and the porciones of land become useless. * * * All is reduced to the class of temporal or land dependent on rainfall for moisture, this failing all fails."

Reynosa: " * * * from their own inspection and knowledge of the lands, they knew that those of this Town and its jurisdiction are all of the same quality, and watered only by rains which are rare in this country and they have no other privileges or watering places except the Rio Grande del Norte, therefore if the porciones have no access to that River they will be valueless, except such as may have perishable water holes on them * * *." See, Baylor Law Rev. 148; Water Law Conference (U. of Tex.1959) 16, 20–23.

47. See, footnote 3; Taylor, op. cit., footnote 9, supra, 87–88.

48. Llano Grande and La Feria Grants: In the denouncement proceeding, the judge found "they were not entirely good

The classification given the lands on petition of the colonists is evidence that irrigation was not intended. The classification controlled the quantity of land the settlers would receive and the price they would pay. It was for this reason that the King's delegates, during the general visits were classifying lands as pastures, arable, or irrigable lands. Thirteen years before the Rio Grande grants, the King had cautioned his Viceroys to determine whether sales were made "without fraud or collusion, and at reasonable prices." Royal Regulation of October 15, 1754, 2 White, 62, 64. When, therefore, the King granted the larger pasture tracts with some arable tracts, instead of the more valuable and smaller irrigation tracts, it would appear that the King too was convinced and believed that irrigation was not practiced and was not feasible along the Rio Grande. The King followed every recommendation to which our attention has been directed, and he did the next best thing for his settlers by granting them large pastures with some arable lands. The colonists, by way of compensation for their failure to receive irrigable lands, received pastures in greater quantities. The conclusion that the King intended to grant irrigation lands, after the classifications denied that quality, is contrary to the facts and the grants made in accord with the King's former decrees. Law 1, Title 5, Book 4, Recopilacion; Laws 5, 8, 13, 18, Title 12, Book 4, Recopilacion; Law 14, Title 17, Book 4, Recopilacion; 2 White, New Recopilacion, 47; Law 5, Title 17, Book 6, Recopilacion.

The location and dimensions of these grants deny a riparian system of irrigation.

Camargo, Mier, Reynosa, Torritos, Santa Ana, Agostadero del Gato, and La Blanca were laid out as narrow elongated porciones fronting upon and at right angles to the river. These porciones included small arable tracts for farming from rainfall, but, instead of being located near the river, they were located at the north ends of the porciones. In Camargo, some porciones began at the north end of the river porciones. In Reynosa, the ejidos or town commons, fronted on the river while porciones numbered seventy-three through eighty were north of the ejidos and cut off from the river. When Reynosa was later moved across the river, the townsite was sold at auction and bought by the owners of the off-river porciones. These several off-river porciones, without river frontage, were classed during the General Visits the same as lands on the river. They were "of the same quality, and watered only by rains." These off-river owners argue that non-abutting lands, under Spanish-Mexican law have the same rights as lands on the river. They do have the same rights, but in the sense that neither was classed as suitable for irrigation, and lands on the river were no better than those which were not. Some grants were very large and extended as far as thirty-six miles north of the river. Their very size argues that the King did not contemplate and would not require that they be irrigated.

There was no intent to grant irrigable lands because irrigation was impossible. In Nuevo Santander irrigation was by gravity and in canals which parallelled the river. Gravity irrigation was then impossible and still is. It was not until the beginning of

---

for sowing because the land was not adapted thereto, nor did they possess any irrigation, nor could they be irrigated from any of the places where there is water, nor do they possess any other benefit, and they are only good at times for the breeding of all classes of stock." See, also, King, Some Irrigation Law Problems Peculiar to the Lower Rio Grande; Water Law Conference, (U. of Tex., 1952–1954) 302.

Concepcion de Carricitos: Water is not mentioned and the land was called "Pastureland" (potrero).

Espiritu Santo: The official who tended to the grant found, "Therefore the land is useful only for horses and cattle because of the security and safety afforded by the fact that the aforesaid ranch has no more than one entrance and exit." It was called a "pasture" (potrero).

this century that modern equipment made irrigation possible. With modern machines, the waters today must be lifted three times. The engineers and land experts of 1767 knew and reported that the river bank was so high that gravity irrigation was impossible, and, as the trial court found, this practical situation foreclosed any intent to grant irrigation rights.

### Mexican Grants.

The Mexican grants even more clearly demonstrate that the lands were classified and intentionally granted without benefit of irrigation waters. It is conceded that under Mexico the former colonial water laws continued in force. Mexico, by express legislation, required land classification prior to a grant.[49] Each grant along the Rio Grande

was classed as pasture land, and many grants still bear their classifications as permanent names.[50]

The Mexican grants were in quantities in excess of the amounts permitted by law for grants of irrigable lands. Under the several Mexican laws, limits upon quantities were imposed upon grants of irrigable, arable, and pasture lands.[51] Mexican laws permitted no grant of irrigable lands in excess of one league, which is another way of saying "sitio de ganado mayor." Every Mexican grant here under inquiry was in excess of one league,[52] which was lawful for pastures and unlawful for irrigable lands.

The Mexican grants were paid for at prevailing prices for the cheaper pasture

49. Mexico: Arts. 6, 7, 8, National Colonization Decree of 1823; 1 Gammel, Laws of Texas, 27, 28; Art. 12, National Colonization Law of 1824, 1 Gammel, Laws of Texas, 38, 39.

Tamaulipas: Colonization Law of Tamaulipas of 1833, 1 Sayles, Early Laws of Texas, 138–140; Arts. 15, 16, 23, Colonization Law of Tamaulipas, 1826, 1 Gammel, Laws of Texas, 457–59. Note that Art. 20 of the last cited statute provides: "The standing waters the lands contain shall likewise be designated and adjudicated with the lands." Such a provision would be unnecessary and seem strange to the common law.

Coahuila and Texas: Colonization Law of 1825, 1 Gammel, Laws of Texas, 40–46; Executive Decree of Sept. 4, 1827, 1 Gammel, Laws of Texas, 180–183; Art. 14, Colonization Law of Coahuila and Texas, 1832, 1 Gammel, Laws of Texas, 298–304. The laws of Coahuila and Texas are not applicable, but they too classified, limited the quantity of and fixed a price on the lands.

50. Potrero (pasture) of San Martin: Sold for large stock. Water not mentioned.

Potrero (pasture) of Santa Isabel: The same.

San Pedro de Carricitos: The grant states "which goes by the name of Potrero (pasture) de los Carricitos." Water not mentioned.

La Blanca: Sold as "pastureland for large stock." Water not mentioned.

Agostadero (grazing) del Gato: Sold as pasture lands. Water not mentioned.

Santa Ana: Sold as "pasture land for large cattle." Water not mentioned.

Los Toritos: Sold as "pasture land for grazing cattle." Water not mentioned.

Ejidos de Reynosa Viejo: Sold "for large stock" at the price fixed by Art. 23, Colonization Law of Tamaulipas, 1926, for grazing land "with running water." 1 Gammel, Laws of Texas, 454–459.

51. National Colonization Law of 1824: "Art. 12. It shall not be permitted to unite in the same hands with the right of property, more than one league square of land, suitable for irrigation, four square leagues in superficies, of arable land without the facilities of irrigation, and six square leagues in superficies of grazing land." 1 Gammel, Laws of Texas, 38, 39.

Colonization Law of Tamaulipas of 1826: "Art. 15. That unit taken as a standard, and observing the distinction to be made on the distribution of lands, between grazing lands, or those suitable for raising stock, and irrigable and temporal tillage lands, this law grants to the contractor or contractors of new towns for every hundred families they introduce and establish in the state five sitios of grazing land and five labores, of which one-half at least shall be temporal land." 1 Gammel, Laws of Texas, 454, 456.

lands.[53] Article 23 of the Colonization Act of Tamaulipas of 1826, stated that the minimum price of pasture lands was "thirty dollars for each league of grazing land, uncultivated, or woodland." 1 Gammel, Laws of Texas, 454–459. See also, Art. 22, Colonization Law of Coahuila and Texas, 1825; Art. 14, Colonization Law of Coahuila and Texas, 1932; 1 Gammel, Laws of Texas, 298–304. It also stated that such pastures "having the benefit of running water" should cost more as determined by two competent persons, chosen by the executive and the settler.

## Comparisons.

### De Hoyos.

We shall now compare these river grants with grants elsewhere in Nuevo Santander, Mexico and San Antonio. Santo Domingo de Hoyos was another village founded by Escandon in Nuevo Santander. There, in 1768, less than a year after the grants along the Rio Grande, the visiting officials made grants. Instead of no irrigation, the experts reported there was irrigation.[54] Instead of grants of two sitios de ganado menor, as on the Rio Grande, there was only one at Hoyos. The official then ordered the lands surveyed and classified "whether for stock or for agriculture." He ordered that "the lots and waters shall be distributed, in order that they may serve as a title for the interested parties." In keeping with the order, the waters were specifically measured and granted. Those who received labores, received grants of water.[55] Those who received pastures obtained documents which did not mention water. At Hoyos there were twenty grants of specified *dulas* or *dias de agua,* along five named irrigation ditches.

The record shows numerous examples of grants of water along several rivers in different jurisdictions of Mexico, between 1603 and 1752. These are used as additional analogous situations wherein waters were specifically granted. There are grants of waters which are riparian to and flowed through haciendas, grants of "one and one half naranjas of water," grants of rights to erect dams and store waters, grants by purchase of "three furrows, two naranjas, and five reales of water" from the "unappropriated and royal waters." There were set-

**52.**

| Grant | Amount | Price |
|---|---|---|
| San Martin | 5 leagues plus | ? |
| Santa Isabel | 7 leagues plus | ? |
| Buena Vista | 6 leagues plus | 40 pesos per league |
| La Blanca | 5 leagues | 30 pesos per league (minimum) |
| Agostadero del Gato | 5 leagues | 30 pesos per league (minimum) |
| Santa Ana | 2 leagues | 36 pesos per league |
| Los Toritos | 2 leagues | 35 pesos per league |
| Ejidos de Reynosa | 4 leagues | 52.50 pesos per league |

**53.**

54. "On the aforesaid day of the said month and day, they each appeared when called: Juan Jose Diaz Guerrero and Barnabe Vasquez, experts, saying that they know well that the demarcated lands enjoy the benefit of irrigation and that the greater part of them have been designated as labores."

55. "I, the aforesaid lieutenant, by virtue of the preceding decree, went to the labor called S. Matias, belonging to Fernando and Carlos Zamora; * * * and the said individuals being present, in the name of His Majesty I gave them permission, adjudicating four days of water to each one, each sixteen days, from the irrigation ditch which leaves the slopes of the San Juan, and I informed them of the conditions expressed in the decree * * *." This was a typical water grant for irrigation.

tlements of disputes by the "privative Judge of lands and waters," sales in cash based upon the measured quantities of waters sold, disputes which arose and were settled by requiring those with grants to limit their uses to the portions of water granted and at their turn, though they had acquired additional lands and needed more irrigation water.

### San Antonio.

We now come to historical and textual materials which are presented without objection by all parties as an aid in discovering the practices of the time. Villa de Bexar, now San Antonio, was another Spanish settlement. Between 1718 and 1731, several missions were established and many of their records are preserved.[56] There were five missions which survived, and each had its own irrigation system from the San Antonio River.[57] The records of each system show multiple instances in which irrigation waters were separately regarded and separately granted.[58] In 1731, fifteen families from the Canary Islands arrived in San Antonio,[59] and they were given lands situated between and fronting upon both the San Antonio River and San Pedro Creek.[60] Upon their arrival, a dispute arose between the missions and the settlers over irrigation waters and Viceroy Casafuerte twice ordered that the Canary Islanders be given water: [61] " * * * although I have issued an official order for the water of the San Antonio River to be distributed proportionately among the families and missions, this has had no effect, nor has it been carried out, because of the objections raised by the president of the missions." He ordered, "that in case there is an insufficient supply for continuous utilization, it shall be used in turns, according to law eleven, chapter seventeen, book four, of the Recopilacion de Indias * * *, so there will be no scarcity of water and everyone may enjoy its benefits." The Governor, thereafter, in accord with the decision, delegated power to deliver the waters to the settlers in words strange to the common-law idea of riparian waters: "I do hereby grant full authority to the lieutenant of this company, Don Matheo Perez, to give possession of said water to the Islander settlers of the Villa of San Fernando, those here now and those who may come later." Perez reported on October 27, 1833,

56. Bexar Archives, Archives Collections, University of Texas Library, Austin, Texas; Castaneda, A Report on the Spanish Archives in San Antonio (1937).

57.

| Mission | | Ditch | Constructed |
|---|---|---|---|
| San Antonio de Valero | | | |
| (The Alamo) | 1718 | Alamo Madre | Moved in 1750 |
| San Jose | 1720 | San Jose Ditch | 1730 |
| San Juan | 1729 | San Juan | 1731 |
| Concepcion | 1729 | Pajalache | 1729 |
| Espada | 1729 | Espada | |
| Canary Islanders | 1731 | San Pedro | 1738 |
| Canary Islanders | 1731 | Upper Labor | 1776 |

58. Castaneda's Report on the Spanish Archives in San Antonio (1937) lists more than 100 sales and exchanges of specific waters at pages 44, 48, 49, 51, 53, 56–58, 61, 66–75, 85, 87, 95–108. A typical water grant is set forth in the footnote to Lewis v. San Antonio River Authority, Tex.Civ.App., 343 S.W.2d 475.

59. Castaneda, Chap. 8, Our Catholic Heritage in Texas (1936).

60. Austin, The Municipal Government of San Fernando de Bexar 1730–1800; 8 The Quarterly of Texas State Historical Association (1905) 277, 338–343.

61. Corner, San Antonio de Bexar (1890) 46.

that he had obeyed his orders, that he went with the municipal officers and the settlers to a named crossing on the river, and "A short distance above it they pointed out the place where the water they had been granted was to be taken, and asked possession thereof, which I gave them. They pulled up plants, threw stones, took water from the river and poured it out, and performed other acts showing actual, quiet, and peaceful possession * * *."[62] About forty years later, the Upper Labor Acequia was constructed. Before irrigation waters from the new ditch were granted, the Governor called on both the Canary Islanders and the missions to produce documentary evidence of any existing rights in the additional waters. Neither could exhibit such a title and water was then granted by drawing lots.

While the riparians argue that San Antonio furnishes an example of an implied promise of irrigation water in consideration of the settlers' willingness to face the dangers of colonization, we find little that is helpful to them. The archives, maps, and history of the Canary Islanders show instead that they received their irrigation rights by express grants. Grants of water were made to persons though they were riparian to both the San Antonio River and San Pedro Creek.[63] Other grants were

made to persons who were not riparian to anything.[64] Land grants, riparian to both streams, were made "sin agua" (without water); water rights were sold and exchanged without regard to riparian status; water grants were devised apart from lands; waters were mortgaged apart from land; and in case of dispute, the quarrel was determined by the title one could exhibit. The appropriators provide additional material illustrating a similar water system in El Paso.

### Los Cinco Senores.

The riparians counter these evidences of non-riparian practices by examples elsewhere in Nuevo Santander. They point to the practice at Los Cinco Senores, another of Escandon's colonies. This was Escandon's residence. The documents relative to this colony show that irrigation was practiced. They show eighty-six separate grants of land to the settlers, and none of them mention water. There are two reasons for this practice in Los Cinco Senores, which appears inconsistent with the examples elsewhere in Nuevo Santander and in Mexico. First, the 1757 Cuervo Report about the colony stated that Los Cinco Senores obtained its waters from springs and not from a river.[65] Springs, not here involved, were governed by different

62. Land grant from Tamaulipas of Padre Island:
    "I * * * led him across the land, he took some earth and scattered it, he picked up a stick, he tore up the grass, he took some water and sprinkled the earth and performed other acts of true possession * * *." State v. Balli, Tex.Civ.App., 173 S.W.2d 522, 530. Taylor, op. cit., footnote 9, supra, 18.

63. A decree from the King to the Texas Governor ordered grants of water: "To each of these fifteen families he shall give possession of the tract of land assigned it, and title to the enjoyment of the possession of the same in the name of his Majesty, and by virtue of this order, and Law IV, Title XII, Book V of the Recopilacion de Indias, charging each family to plant trees on the boundaries of its tract of land, and to make use of the waters of the San Antonio

River. The Governor must remember that, in this division, he shall apportion the tracts of land and the water equally among all the families." Austin, The Municipal Government of San Fernando de Bexar 1730–1830; 8 Quarterly of the Texas State Historical Association 277, 338–343.

64. 1 Kinney, Irrigation and Water Rights, 1002–1003. For a discussion of other Spanish and Mexican grants in Texas, See, White and Wilson, The Flow and Underflow of Water, Motl v. Boyd, 116 Tex. 82, 286 S.W.2d 458.

65. "The Villa of Santander (Los Cinco Senores) is the only settlement which, by reason of several springs which rise at a distance of two or three leagues to the north and form an arroyo, has succeeded in irrigating with spring water." 11 Estado General del Nuevo Santander 12–13.

laws.[66] Second, certain express water grants were made at Los Cinco Senores. The Mission had an express grant.[67] Also, Escandon, the Count of Sierra Gorda, the founder of the village had a water grant. The documents about the village show that from and by the grace of his Lordship, Escandon, the community and settlers received waters on the basis of one week for him, and one week for everybody else.[68]

■ We arrive therefore at our conclusions about the Spanish and Mexican law. The trial court's first conclusion of law, that a specific Spanish or Mexican grant of Rio Grande waters was necessary for irrigation waters is sound. That conclusion finds support in the decrees of the King, the Codes, the commentators, Escriche excepted, and the legal experts. The acts done in making the Lower Rio Grande grants refute any intent to grant waters with the land. The King, the Council, the Viceroy, the Governor, the settlers, the experts, and the surveyors, on the day the grants were made, knew and understood what the settlers asked for and what was granted. The settlers neither wanted nor expected irrigation waters. The classifications given the lands, the quantities granted, the consideration paid, and the impossibility of irrigation, show that there was no implied grant of irrigation waters. The conclusion is further supported by the contemporaneous comparative practices elsewhere in Nuevo Santander, at San Antonio, El Paso, and in the several provinces of Mexico. From all these sources, Escriche excepted, we find nothing about "riparian rights" in connection with irrigation. We find nothing about "watersheds", the "natural flow

of the stream," a right to "flowing waters." Instead, we find an emphasis upon land use rather than land location. The Spanish and Mexican irrigation system was not a riparian system.

## IV. Stare Decisis.

The fourth issue in this case is whether, as the trial court found, stare decisis has settled the law in Texas that Spain and Mexico had a riparian system of irrigation. The riparians, in support of that conclusion, argue that Texas cases have consistently followed Motl v. Boyd, 116 Tex. 82, 286 S.W. 458. The appropriators argue that no Texas Court has previously been presented with the issue and that any comments by judges on the subject here at stake were outside the facts of the case.

■■ What is stare decisis? It is "A deliberate or solemn decision of a court or judge made after argument on a question of law, fairly arising in a case, and necessary to its determination." Chamberlain, Stare Decisis, 19. Stare decisis does not arise when there is "an opinion expressed by a judge on a point not necessarily arising in a case; an opinion of a judge which does not embody the resolution or determination of the court, and made without argument, or a full consideration of the point * * *." Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, 1126, L.R.A.1915E, 1. The strength of the common law and its stare decisis rule lies in that thoroughness with which a case is tried after investigation and argument of issues fairly arising. To the extent that a court overflows the issues and seeks to declare rules of law into being by avulsion instead of

66. See footnote 14.

67. "And the lands granted to the Mission of Helguera are contained therein, and one sitio of pasture land for large stock with eight surcos (furrows) of running water from the said Villa, on which His Lordship has commenced a project of labor at his expense."

68. "The Senor Count (Escandon) has a grant of eight surcos (furrows) of this

water for the irrigation of his farm; and since it has diminished in quantity and some years there has not been enough water for the benefit of the citizens, the said Senor has relinquished half of the irrigation, and one week His Lordship irrigates, and the next, the community." Cervantes, Documentos Relativos a la Villa de los Cinco Senores (Mexico, 1947), 184.

accretion, it destroys the system. Courts are not legislatures; courts decide cases. Until the case arises, there is no precedent; there is no stare decisis. Comments on sterile abstract situations lack the vitality of actuality. The solemnity and seriousness with which a court investigates and writes upon an irrelevant point, may entitle it to respect, but it is the respect due any learning and not the respect of a rule of law by which inferior courts are bound. Chief Justice Marshall once wrote concerning general expressions, "If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."

▇▇▇▇ Motl v. Boyd is stare decisis on many matters which were in issue. On those matters we are bound. We do not presume to overrule the case. It has been often cited and properly so, on the issues within the case. We are not, however, bound by dicta, commentary, or advisory remarks, for "it is a cardinal rule of construction that decisions are to be construed in the light of the facts on which they are based." Maruska v. Missouri, K. & T. R. Co. of Texas, Tex.Civ.App., 10 S.W.2d 211. " * * * when the courts have a question presented to them for decision for the first time they have never regarded themselves as bound by obiter dictum." State ex rel. Childress v. School Trustees of Shelby County, 150 Tex. 238, 239 S.W.2d 777, 782; accord, Mitchell v. Town of Refugio, Tex.Civ.App., 265 S.W.2d 261.

▇▇▇▇ We assert that no Texas Court has heretofore been called upon to decide whether Spanish and Mexican land grants have appurtenant irrigation rights similar to the common-law riparian right. We shall state our reasons that Motl v. Boyd's com-

ments on that subject are pure dicta, shall point out gross errors inherent in the dicta, and show that the ratio decedendi of the dicta compels an opposite result in this case.

1. Motl v. Boyd concerned a contest between grantees from the State of Texas and was governed by statutory and common law. It did not and could not even incidentally involve Spanish or Mexican grants. Spanish and Mexican law was foreign to the issue and irrelevant. The opinion contained three pages of prefatory dicta about the laws of Mexico, the State of Coahuila and Texas, and the State of Tamaulipas. Those laws in no conceivable way could have determined the applicable common and statutory law pertaining to a Texas grant. Certainly, Mr. Motl and Mr. Boyd did not rely upon the Mexican laws.

Because the issues did not concern the Spanish and Mexican law, there was no occasion for a true adversary proceeding to determine what that law was. The case totally ignores the Spanish law. In the case of Spanish grants, certainly the contemporaneous Spanish law is important. Recopilacion and the commentators of the Colonial period are unmentioned, and the Mexican law cannot be fully understood except in the context of its antecedents. The case did not discuss the Mexican law writers. Even in the discussion of the Mexican statutes, the emphasis is upon the Colonization Law of the State of Coahuila and Texas, not here involved. Perhaps, more serious than the above omissions, however, Motl v. Boyd was written without examination of a single grant from Spain, Mexico, or the State of Tamaulipas. The Court did not know what in fact was done, what was intended, or what was granted by any Spanish or Mexican grant.[69] When we compare the skills with which Spanish and

---

69. Compare, Chief Justice Roberts in State v. Cuellar, 47 Tex. 295, 306: "To which may be added, that in a matter of so much importance as that which is involved in this and other similar suits, it may be well, before a final de-cision of them, to make a more thorough search than has been made heretofore into the laws of Spain relating to the nature of this title, which each settler received at the foundation of the town, * * *."

Mexican materials have been discovered and presented to this Court in a true adversary proceeding, with the absence of such vital material in Motl v. Boyd, we can appreciate the reasons that stare decisis limits that opinion to the issues presented by the case. 14 Am.Jur., Courts, § 83.

2. Because the Court wrote before the issue arose and adversaries made proof, it assumed untrue and non-existent situations. We shall mention several of these errors. First, the Court assumed that river grants were. made in quantities permitted by the Spanish and Mexican law for lands classed as irrigable. To prove the importance of this element, the Court quoted Article 12, National Colonization Law of 1824, and also Article 12, Colonization Law of Coahuila and Texas of 1825. The Court correctly wrote that irrigable lands were granted in smaller quantities than lower classifications, but erroneously assumed that river grants were always for the lesser quantity. The record in this case shows that every acre of the land along the Lower Rio Grande was granted as pasture land, in quantities greatly in excess of the legal limits for irrigable lands. Every grant which is involved in this suit, if intended as irrigable land, would have violated the legal quantity limits for such classification.[70]

Motl v. Boyd's second error is its assumption that the river grants were sold at the higher prices required by the laws of Mexico for lands classed as irrigable lands. The Court correctly wrote that irrigable lands were dearer and pastures cheaper. To emphasize the difference in prices, the Court italicized that portion of the Mexican statute which showed that irrigable lands cost more. It then, without inquiry, concluded that river grants were automatically irrigation lands, and commanded the higher price. The true facts disclosed by this record show that none of the lands were classed as irrigable, and they were paid for on the basis of the cheaper classification. These lands were pastures, so petitioned, so named, so sold.[71]

Motl v. Boyd's third error is its assumption that "planting meant irrigation." The erroneous idea has been widely assumed.[72] Many Mexican statutes and laws classed lands in three categories instead of two.[73] Some of the Mexican laws quoted in Motl v. Boyd state the three classifications, but the opinion only recognizes irrigable and non-irrigable lands. Lands were actually classified as (1) suitable for irrigation, (2) arable without the facilities of irrigation, and (3) grazing. The significance of the error is that lands could be classed as farming with irrigation, farming without irrigation, or grazing. All the lands along the Lower Rio Grande were governmentally classified as non-irrigable lands.[74] In McCurdy v. Morgan, Tex.Civ.App., 265 S.W. 2d 269, 272, lands were classified in the identical manner as the lands in this case. The grant was of one league of pasture land, including a labor of land which was subject to cultivation but dependent solely on ordinary or natural rainfall. The Court there said: "This statement in the grant is of importance. It constitutes or reflects an official classification of the land made in pursuance of governmental authority and demonstrates that Chiltipin Creek was not

70. See footnote 51.

71. See footnotes 51, 52; King, Water Law Conference (U. of T., 1952–1954) 303–304; Walker, Water Law Conference (U. of T.1959) 41–45.

72. Davenport and Canales, The Texas Law of Flowing Waters (1949), 15–16; Mann, Riparian Rights as Declared and Enforced by the Courts, Water Law Conference (U. of Tex.1954), 169, 171; Davenport, Riparian v. Appropriative

Rights, Water Law Conference (U. of Tex.1954), 138, 143 ("To Spanish Americans of the 18th century, cultivation and irrigation were synonymous terms"); Davenport, Law of Flowing Waters, 8 Bay.L.Rev. 139, 153 ("Throughout the seventeenth, eighteenth and the early nineteenth centuries, planting meant irrigation in Texas * * *.").

73. See footnotes 22, 23, 24, 25, 45, 49, 51.

74. See footnotes 43, 46, 48, 50.

regarded as a reliable source of irrigation." The Supreme Court's refusal of a writ shows that governmental classification was important. Had the Court in Motl v. Boyd known that Spain and Mexico granted no irrigable lands along the Lower Rio Grande, it would have given force to the classification as it later did, when considering the McCurdy case. Apparently the Supreme Court did not feel bound by the erroneous dicta in Motl v. Boyd about classifications.

Motl v. Boyd's fourth error is the assumption that a system of laying out lands with limited river frontage is evidence of a riparian system. With respect, it is suggested that proximity to a river is as important to a system of water appropriation as it is to a riparian system. The fact that lands are laid out so as many persons as possible will have river frontage may indicate an interest in irrigation, but it does not prove that only a riparian system would have that interest.

Motl v. Boyd's fifth error is one of logic. It reasoned that Mexico recognized irrigation and practiced it; and therefore Mexico had a riparian system. It proceeds upon the belief that because it discovered the word "irrigation" in the laws of Mexico, it had discovered a "riparian system." The Court seven times emphasized and italicized the term "irrigation". The assumption is that irrigation is practiced only by a system of riparian waters. This is the circular argument: Irrigation is proof of a riparian system; Mexico was interested in irrigation; therefore, Mexico had a riparian system. Irrigation, indeed, was a subject well known to Spain and Mexico. Their experiences, from the days of the Moors, had resulted in a water system evidenced by water measurements, water courts, water judges, water administration and water grants. Their legal authorities, Escriche excepted, wrote of water grants for irrigation, but not of a riparian system. Interest in irrigation no more proves a riparian system than it proves an appropriation system. The Western States witness that fact.

3. Motl v. Boyd adds up its former errors to make its final one. It reasons that, (1) if the lands were in fact sold in quantities permitted only for irrigable lands, (2) if the price paid was the higher price charged for irrigable lands, and (3) if the lands were laid out with limited frontage upon the river, they were intended to have riparian irrigation rights.[75] When we apply the true facts to the Court's reasoning, it would follow that (1) since the lands were sold in quantities permitted for pastures and prohibited for irrigable lands, (2) since the price paid was the cheaper price permissible only for pastures, and (3) since the lands had limited frontage on the river, they were intended to be pasture lands and not irrigable lands. The Rio Grande lands involved in this suit were officially classed as pastures, which is contrary to the facts assumed in Motl v. Boyd.

We conclude that (1) rights under titles from Spain, Mexico and Tamaulipas are governed by the law of the sovereigns when the grants were made, (2) those sovereigns did not have a system of riparian irrigation rights based upon or similar to the common law right to irrigate, (3) the grants involved in this suit were not made with the implied intent or agreement that the right to irrigate was appurtenant to the lands, and (4) this issue has never before been presented to a Texas Court for

75. "It is too plain for debate that the Mexican government, through the central government of Mexico, and through those of Coahuila and Texas and Tamaulipas, was much concerned with, and undertook to regulate to some extent, the subject of irrigation and water rights. It would be unreasonable to say that these governments sold or assigned lands to colonists, charging therefor a differ-ent price for irrigable lands to that charged for other lands, limiting the quantity of irrigable lands which might be granted to one person and providing for surveys to front one-fourth or one-half on the streams, without meaning by such acts and decrees to give to the landowners rights, to use the water for irrigation as well as other purposes." Motl v. Boyd, 286 S.W. 458, 465.

decision and there is no stare decisis on the subject.

The judgment is reversed and rendered. Lands riparian to the Lower Rio Grande do not have an appurtenant right to irrigate with the river waters.

MURRAY, Chief Justice (dissenting).

I do not concur.

It is my opinion that the rule of "Stare Decisis" compelled the trial court to recognize a riparian right to irrigate land in Texas, patented before 1889, and that such general rule applies to lands granted by the Kingdom of Spain or by the Republic of Mexico (or any of her States). This, in my opinion, is what in substance was decided by the Supreme Court of this State, speaking through Chief Justice Cureton, in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, opinion dated June 26, 1926.

The Austin Court of Civil Appeals, speaking through Associate Justice Brady, in Boyd v. Motl, 236 S.W. 487, opinion dated January 11, 1922, laid down the general rule that all lands bordering navigable streams in this State, patented by the State of Texas prior to the Appropriation Act of 1889 (Chapter 88, 21st Legislature), were invested with riparian irrigation rights, which were property rights that could not be taken away except by a condemnation or the payment of compensation. It will be noticed that in the Court of Civil Appeals the single law firm of Blanks, Collins & Jackson of San Angelo, represented the appellants, and Hill & Hill of the same City, represented the appellees, but in the Supreme Court we find in addition to Hill & Hill, four law firms: Gaines & Gaines, Seabury, George & Taylor, Andrews, Streetman, Logue & Mobley, and Hudson & Starley, were representing Motl, the plaintiff in error. "The following attorneys filed briefs and arguments on questions here involved as amici curiae by permission of the court, and on behalf of various clients whose interests would be affect-ed by the decision: Seay, Malone & Lipscomb, and D. W. Glasscock; C. R. Wharton; J. E. Starley; John M. Corbett; Crate Dalton; Lindsley M. Brown; J. A. Drane and Palmer & Russell; and Clay Cooke." Page 92, Vol. 116, Texas Supreme Court Reporter.

There can be no question but that the case of Motl v. Boyd took on a statewide aspect in the Supreme Court and became of general interest throughout the State. It is further apparent that these lawyers scented the far-reaching effect of the Court of Civil Appeals opinion, and attempted to have the decision reversed entirely, or to have the Supreme Court except from the holding, lands included in Spanish and Mexican grants made prior to the adoption by Texas of the common-law rules of construction of England in 1840. The Supreme Court affirmed the decision of the Court of Civil Appeals, and refused to exempt Spanish and Mexican grants from its far-reaching effect.

Chief Justice Cureton, speaking for the Supreme Court in Motl v. Boyd, 286 S.W. 458, devoted the first eight columns of his opinion to a discussion of the history of the Mexican law and its control and influence on early grants in Texas, and came to the conclusion that lands contained in early Spanish and Mexican grants were invested with riparian irrigation rights the same as other lands in Texas. In the course of his opinion, Chief Justice Cureton, in speaking of the rights of appropriators against those of riparians, said:

"This course is insisted on with so much force and so earnestly that we have concluded to investigate the whole subject for the purpose, if we can, of ascertaining the rule applicable in this state, and of harmonizing our statutes and decisions and setting at rest, in so far as we can, the question involved."

There can be no doubt that Chief Justice Cureton seriously intended to lay down the law governing the rights of all landowners to use water from navigable streams

and rivers in Texas, whether or not such lands were originally within Spanish or Mexican grants, and that such was the intention of the other members of the Supreme Court, as apparently they all concurred. And, further, there can be no doubt that the bench and bar of this State accepted such law as settled, and followed it up to the present time.

In Shepard's Texas Citations, Case Edition, 1949, Motl v. Boyd is shown to have been cited some forty-six times by Texas Courts, and eleven times in Law Review Articles, and three times in American Law Reports. Some of the cases are as follows: Miller v. Letzerich, 121 Tex. 248, 49 S.W. 2d 404, 85 A.L.R. 451; Texas Co. v. Burkett, 117 Tex. 16, 296 S.W. 273, 54 A.L.R. 1397; Manry v. Robison, 122 Tex. 213, 56 S.W.2d 438; Diversion Lake Club v. Heath, Tex.Civ.App., 58 S.W.2d 566, 570, 571, affirmed 126 Tex. 129, 86 S.W.2d 441; State v. R. E. Janes Gravel Co., Tex.Civ.App., 175 S.W.2d 739, 742. In Shepard's Texas Citations, Supplement 1949–1955, to Case Edition, 1949, Motl v. Boyd is shown to have been cited by Texas Courts some fifteen times, and in Law Review articles some ten times; and again in Shepard's Texas Citations, February, 1961, paper-back booklet, Motl v. Boyd is shown to have been cited in seventeen cases and eight Law Review articles. Certainly, Motl v. Boyd is one of the celebrated cases rendered by our Supreme Court and should not lightly be disregarded. Some of the most recent cases citing Motl v. Boyd are: Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728; State v. Heard, Tex.Civ.App., 199 S.W.2d 191, affirmed Heard v. State, 146 Tex. 139, 204 S.W.2d 344; Greenman v. City of Fort Worth, Tex.Civ.App., 308 S.W.2d 553, wr. ref. n. r. e.; Great American Development Co. v. Smith, 303 S.W.2d 861, no writ history; Mitchell v. Town of Refugio, Tex. Civ.App., 265 S.W.2d 261, wr. Ref.

In 21 C.J.S. Courts § 197, p. 343, it is stated:

"Decisions of a court of last resort are to be regarded as law and should be followed by inferior courts, whatever the view of the latter may be as to their correctness, until they have been reversed or overruled, * * *."

The majority have refused to follow the language found in Motl v. Boyd, covering Mexican and Spanish land grants, and have declared such language to be "obiter dictum".

If such language is dicta at all, it is judicial dicta and should be followed by this Court, and should be controlling in the disposition of the case at bar.

Judicial dicta is to be distinguished from mere obiter dicta. 14 Am.Jur., Courts, § 83, pp. 297–298; Deramus v. Thornton, Tex., 333 S.W.2d 824; Parker v. Bailey, Tex.Com.App., 15 S.W.2d 1033; Thomas v. Meyer, Tex.Civ.App., 168 S.W.2d 681.

The holdings made in Motl v. Boyd, supra, by the Supreme Court, undoubtedly have established a rule of property in this State. No doubt a great deal of land has been purchased and sold relying upon such rule of property, and the same should not at this late date be set aside and disregarded as being mere "obiter dicta", and especially it should not be done by a Court of Civil Appeals.

In 11 Tex.Jur., § 96, p. 839, under subject Stare Decisis, it is stated as follows:

"Particularly does the doctrine of stare decisis apply when a rule has been once deliberately declared and uniformly followed; in such case it will not be abandoned except upon the most urgent reasons."

And in § 97, p. 841, it is further stated:

" * * * Thus the decisions of the Supreme Court upon land titles become a rule of property and as such are binding upon all courts in which title may be drawn in litigation."

Smith v. Power, 23 Tex. 29, 32. In Mayman v. Reviere, 47 Tex. 357, Justice Gould, speaking for the Supreme Court, said:

884

"In Terry v. Terry['s Estate, 39 Tex. 313], supra, it was held by our predecessors, construing this law, that the surviving widow is 'entitled to an allowance in lieu of a homestead, and also in lieu of such personal property exempt by law from forced sale, as her husband did not leave her at the time of his death, and under article 5487 so much of the property as is required to make good these allowances, is not otherwise subject to administration.' Whatever difficulty we might have had in arriving originally at these conclusions, it is reasonable to assume that the decision in Terry v. Terry was followed by the District Courts throughout the State; and the injurious effects which would probably result from a contrary construction at this late day constitute a sufficient reason why we should treat the question as settled."

In Farmers' Loan & Trust Co. v. Beckley, 93 Tex. 267, 54 S.W. 1027, 1030, Justice Brown, speaking for the Supreme Court, said:

"The counsel for appellees vigorously attack the doctrine that the express retention of a lien in the deed or note for the purchase money makes the deed executory. The rule has been too long established, and has become the basis of too many property rights for the courts to overturn it. It is a rule to which persons may conform, and with which the profession are familiar. The Legislature must deal with this question, if it is to be changed."

In Southland Royalty Co. v. Humble Oil & Refining Co., 151 Tex. 324, 249 S.W. 2d 914, 916, Justice Calvert, speaking for the Supreme Court, said:

"It may be noted here that respondents suggest a re-examination of the Parker [Parker v. Parker, Tex.Civ. App., 144 S.W.2d 303] and George [French v. George, Tex.Civ.App., 159 S.W.2d 566] cases on the theory that the courts should not attribute to lessors jointly executing a general form lease, without more, an intent to pool or unitize their properties; that the language of the general form lease was never intended to effect or to operate as a pooling agreement. This argument is not entirely unappealing. The Texas rule in this respect is not of universal application. See 116 A.L.R. 1267, et seq. On the other hand, the law of the Parker and George cases have now become a rule of property in this state and 'should not be changed in the absence of other controlling circumstances, even though good reasons might be given for a different holding.' Tanton et ux. v. State National Bank of El Paso et al., 125 Texas 16, 79 S.W.2d 833, 834 [97 A.L.R. 1093]."

In Uvalde Rock Asphalt Co. v. Hightower, 140 Tex. 200, 166 S.W.2d 681, 683, 143 A.L.R. 1366, reversing Tex.Civ.App., 154 S.W.2d 940, the Commission of Appeals of Texas, speaking through Commissioner Hickman, said:

"Whether or not the rule is subject to the criticism leveled at it will not be considered here. It has been the established rule in this state for many years, recognized by textwriters and courts and should not now be changed by judicial decree."

In Mitchell v. Town of Refugio, 265 S.W. 2d 261, 267, error refused, Justice Norvell, speaking for this Court, said:

"As to historical facts, there is an instance where the Supreme Court of the United States modified a rule of law theretofore declared when the results of an historical study of the jurisdiction of the English Chancery Courts in the time of Queen Elizabeth were brought to its attention. Vidal v. Girard's Executors, 2 How. 127, 11 L.Ed. 205, and Baptist Association v. Hart's Executors, 4 Wheat. 1, 4 L.Ed. 499.

This was an instance of a re-examination of its previous holding by a court of final jurisdiction. No doubt other examples may be found in the books. Historical facts are commonly brought to light and the practical, as distinguished from the theoretical, field of judicial knowledge may be enlarged and call for a re-examination of judicial holdings. However, if property rights be involved and a rule declared by the Supreme Court be directly applicable, such rule should be followed by inferior courts in the absence of extraordinary and unusual circumstances. The trial court based its judgment upon this principle and we believe correctly so. Appellants' theory is essentially another argument why it should be held that title to the river bed passed to the Town of Refugio under and by virtue of legislative enactments prior to 1850. It may be supported by additional historical information not heretofore considered, but if the holding that title did not pass to the town until 1929 is to be changed, such change must be effected by the court that made the holding. For appellants to prevail, the Heard decisions must be overruled and such action lies beyond the authority of this Court."

In Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424, 442, Justice Slatton, speaking for the Supreme Court, said:

"Since the Century and Gulf-Atlantic cases were decided so many years ago and many property rights have no doubt been acquired under them, we should not at this late day change them, even though doubt as to their correctness may exist in the minds of some lawyers and judges."

There are other issues in the case, but as I have taken an entirely different approach from that of the majority I can see no purpose in discussing such issues in this dissenting opinion.

I respectfully dissent from the opinion of the majority.

MURRAY, Chief Justice, and BARROW, Justice.

■ This cause was filed in this Court on November 30, 1959. A question arose as to the qualification of Associate Justice POPE to sit in the case in view of the fact that he owned an undivided interest in lands within the grants involved herein abutting on the Rio Grande River, and other land within the grants that does not abut on said river. Neither Justice POPE nor any of his relatives are named as parties to this cause and the question arises only by reason of the fact that this is a class action.

On August 29, 1960, letters were written to all of the attorneys connected with this case, explaining to them the situation with regard to Justice POPE. No motion to disqualify Justice POPE was filed. Before the cause was argued, Justice POPE and the members of his family sold these lands. Members of Justice POPE'S family still own vendor's lien notes against the land, but he has disposed of his interest in the vendor's liens.

When the case was called for oral argument, the Chief Justice again called this matter to the attention of the attorneys in the case and again gave them an opportunity to discuss the matter, to ask any questions, and to make any motions they might care to make. The consensus of opinion seemed to be that Justice POPE was not disqualified to sit in this case. Justice POPE has asked his associates to pass upon this matter.

We have carefully and fully considered the matter and have come to the conclusion that Justice POPE is not only not disqualified to sit in this case, but it is his duty to do so. We regard the law so well settled on this question that a discussion is unnecessary. See, Hidalgo County Water Improvement Dist. No. 2 v. Blalock, 157

Tex. 201, 301 S.W.2d 593; Elliott v. Scott, 119 Tex. 94, 25 S.W.2d 150; Winston v. Masterson, 87 Tex. 200, 27 S.W. 768; Texas Employers Ins. Ass'n v. Davidson, Tex. Civ.App., 290 S.W. 871; City of Dallas v. Armour & Co., Tex.Civ.App., 216 S.W. 222; New Odorless Sewerage Co. v. Wisdom, 30 Tex.Civ.App. 224, 70 S.W. 354.